[No. D014843. Fourth Dist., Div. One. May 5, 1993.]

DIESEL ELECTRIC SALES AND SERVICE, INC., Plaintiff and
Appellant, v.
MARCO MARINE SAN DIEGO, INC., Defendant and Respondent.

## COUNSEL

Gans & Blackmar, Gans, Blackmar & Stevens and James C. Stevens for Plaintiff and Appellant.

Alford & MacLeod and Daniel B. MacLeod for Defendant and Respondent.

## OPINION

**WORK, J.**—Diesel Electric Sales and Service, Inc. (Diesel) appeals a nonsuit judgment in favor of Marco Marine San Diego, Inc. (Marco or, alternatively, Marco San Diego) which dismissed Diesel's action against Marco alleging secret, unearned discounts in violation of Business and Professions Code[1] section 17045. After Diesel completed presenting its evidence at trial, the court granted Marco's motion for nonsuit upon the grounds Diesel failed to present substantial evidence that Marco's discounts were secret and unearned, that Marco purchased on like terms and conditions, that there was injury to competition, and that it suffered an injury. Diesel contends it presented substantial evidence in support of all elements of a section 17045 violation and, as a result, the court's nonsuit order against it constitutes reversible error. It also contends the court erred in excluding testimony by its damages expert. Because we conclude Diesel's evidence, when viewed in a light most favorable to it, establishes sufficient evidence of a prima facie violation of section 17045, we hold the court erred in granting the nonsuit motion and, as a result, the judgment in favor of Marco must be reversed. Further, we conclude the court erred in excluding testimony by Diesel's expert on damages.

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified.

I

Diesel conducted business in San Diego from 1962 through 1990. Its business consisted of selling hydraulic hose and fittings to the San Diego tuna industry and repairing component parts of diesel engines used in that industry. In 1974, Diesel began distributing Imperial Eastman brand hose and fittings to the tuna industry. The Imperial Eastman brand was manufactured by Imperial Clevite Corporation (Imperial Clevite) and sold to either original equipment manufacturers (OEM's) or distributors of its products.

Imperial Clevite sold its products to distributors at prices based upon its list price schedules which were periodically revised. Distributors received a minimum discount (e.g., 40 percent) off the list price and also received additional discounts for large volume orders. Distributors could not, however, combine several separate orders together to qualify for a higher volume discount, as such discounts were available only on a per order basis.

Marco San Diego contacted Imperial Clevite about becoming a distributor of its products, but it was initially unsuccessful. However, Marco San Diego then enlisted the aid of its parent holding company, Marco Construction and Design Corporation (Parent Company), and other subsidiaries of the Parent Company in an attempt to lure Imperial Clevite to sell its products to it and the other subsidiaries at the maximum discount off the list price based upon their combined "annual usage" for the past year, as opposed to the usual "per order" discount. In a proposal letter to Imperial Clevite dated December 14, 1982, Marco Seattle Inc. (Marco Seattle), an operating subsidiary of the Parent Company and an original equipment manufacturer, explained the corporate relationships of the Parent Company and its various subsidiaries. The letter requested two shipment locations, Seattle and San Diego, and indicated Marco Seattle and Marco San Diego would submit separate purchase orders, and it stated the expectation that all subsidiaries be under one "pricing umbrella." Imperial Clevite accepted these terms and began to sell its products to the subsidiaries of the Parent Company. Its records designated Marco San Diego as a distributor, yet it always gave Marco San Diego the maximum volume discount regardless of the amount it ordered. Marco San Diego received these discounts from 1983 through at least 1987, even though its purchase volume did not meet Imperial Clevite's expectations.

When Diesel learned Imperial Clevite was selling its products to Marco San Diego, Fred Strachan, Diesel's president, inquired of Imperial Clevite as to what pricing Marco was receiving. Strachan was informed it was extending to Marco "exactly" the same pricing as it was offering Diesel. Further,

he was told Marco was purchasing off of the same distributor price list as Diesel was. However, Imperial Clevite failed to inform him Marco received the maximum volume discount on all of its purchases regardless of the quantity of each order. Since Marco and Diesel had an arrangement whereby each could buy products from the other at the other's cost plus 10 percent, Diesel could deduce what price Marco was paying for Imperial Clevite products. However, Diesel remained unaware that Marco was receiving the maximum volume discount even though it did not order a sufficient volume to qualify for such discount.

After Marco entered the market in the distribution of Imperial Clevite products, Diesel's sales declined and it lost customers. In 1983, the year Marco became a distributor, Diesel's gross sales dropped by $82,664 from the preceding year and its profits declined by $44,354. In 1984, its gross sales dropped an additional $66,700 and its profits declined an additional $31,183. In 1985, its gross sales dropped to a level of only $17,881 with a decline in profits by 72 percent. Unless Diesel sold at a loss, it could not meet Marco's pricing.

In 1985, Diesel filed this action against Imperial Clevite and Marco alleging violations of section 17045. After Diesel completed its introduction of evidence at trial, Marco moved for a judgment of nonsuit. Marco essentially cited the following grounds for its motion:

1.  section 17045 does not apply to buyers;

2.  the discounts extended to Marco were not "secret";

3.  Diesel failed to prove Marco "intended" to destroy competition;

4.  interdivision transfers or transfers between subsidiaries do not violate section 17045.

5.  Marco and Diesel were not purchasing on "like terms and conditions"; and,

6.  application of section 17045 in this case would constitute an unreasonable burden upon interstate commerce.

The court granted Marco's motion for nonsuit. It based its decision upon the following grounds:

"1.   the discounts received by [Marco] were not secret in that the element of secrecy requires more than nondisclosure;

"2.   the discounts received by [Marco] were not unearned because all the [Parent Company] outlets purchased from the manufacturer, [Imperial Clevite];

"3.   [Marco] and [Diesel] were not purchasing on like terms and conditions in that [Marco] purchased on a quotation basis;

"4.   competition was not injured in that another distributor, namely, [Marco], was established;

"5.   the discounts received by [Marco] did not cause [Diesel] any injury in that [Diesel] could have purchased from [Marco] at its cost plus ten percent (10%)[.]"

When Marco inquired of the court whether its grant of the nonsuit was based in part upon Marco's assertion that application of section 17045 would be unconstitutional as an unreasonable burden upon interstate commerce, the court initially responded "partly, but not necessarily" and then definitively stated, "I am not basing [the grant of nonsuit] on that." The court then entered judgment for Marco.

## II

Motions for nonsuit are authorized by Code of Civil Procedure section 581c which states in pertinent part:

"(a)   After the plaintiff has completed . . . the presentation of his or her evidence in a trial by jury, the defendant . . . may move for a judgment of nonsuit.

"(b)   If it appears that the evidence presented . . . supports the granting of the motion as to some but not all of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed as to the issues remaining. . . .

"(c)   If the motion is granted, . . . the judgment of nonsuit operates as an adjudication upon the merits."

A trial court must not grant a nonsuit motion unless the plaintiff's evidence, viewed most favorably to the plaintiff, could not possibly support a jury verdict for the plaintiff. As the California Supreme Court stated: "A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. [Citations.]"

(*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838 [206 Cal.Rptr. 136, 686 P.2d 656].) Further, the Supreme Court explained how the plaintiff's evidence must be viewed by a court considering a nonsuit motion, stating: "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . .'" (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036], quoting *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].) ■ As an appellate court, we are similarly bound by the "rule requiring evaluation of the evidence in the light most favorable to the plaintiff." (*Carson* v. *Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.) Further, not only must we view the evidence most favorably to the plaintiff and most strongly against the defendant, but we must also resolve "all presumptions, inferences and doubts in favor of the plaintiff." (*Mason* v. *Peaslee* (1959) 173 Cal.App.2d 587, 588 [343 P.2d 805].)

As the Supreme Court noted: "Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.] Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit. [Citations.]" (*Carson* v. *Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.) Thus, if the plaintiff's evidence, when viewed most favorably to the plaintiff, constitutes substantial evidence in support of a jury verdict in favor of the plaintiff, if one were ultimately so rendered, then a motion for nonsuit must be denied. (*Raber* v. *Tumin* (1951) 36 Cal.2d 654, 656 [226 P.2d 574].) Alternatively stated, if the plaintiff's evidence, when most favorably viewed, provides substantial evidence in support of each element of a prima facie case without any affirmative defense, then a nonsuit judgment is improper and must be reversed.

## III

### A.

■ Section 17045 is part of California's Unfair Practices Act (Act) and provides: "The *secret* payment or *allowance of* rebates, refunds, commissions, or *unearned discounts*, whether in the form of money or otherwise, or

secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, *to the injury of a competitor and where such* payment or *allowance tends to destroy competition, is unlawful.*" (Italics added.) Thus, as relevant to this case, there are three elements to a violation of section 17045. First, there must be a "secret" allowance of an "unearned" discount. Second, there must be "injury" to a competitor. Third, the allowance must tend to destroy competition.

Section 17045, like the other provisions of the Act, must be "liberally construed" to serve its purposes. (§ 17002.) The Legislature declared that the purpose of the Act is: "to safeguard the public against the creation or perpetuation of monopolies and *to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.*" (§ 17001, italics added.) In general, the Act closely parallels the federal Robinson-Patman Antidiscrimination Act (15 U.S.C. § 13), which also prohibits price discrimination. (*G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 271 [195 Cal.Rptr. 211, 41 A.L.R.4th 653]; *Great A&P Tea Co.* v. *FTC* (1979) 440 U.S. 69, 75-76 [59 L.Ed.2d 153, 160-161, 99 S.Ct. 925].)

### B.

█ Applying the evidence in this case as viewed most favorably to Diesel to the three elements of section 17045, we conclude Diesel introduced substantial evidence in support of a prima facie case against Marco for violation of section 17045. Accordingly, a nonsuit judgment was improper and the court reversibly erred in entering judgment for Marco.

The first element requires evidence of a "secret" allowance of an "unearned" discount. (§ 17045.) Strachan, Diesel's president, testified he was unaware that Marco received the maximum volume discount even though its orders were insufficient for it to ordinarily qualify for such discount. In fact, Imperial Clevite expressly informed him at the outset that Marco was receiving the "same pricing" as Diesel. Further, even when Strachan was later informed by a Marco employee that it was receiving the "large volume discount," he was not informed Marco did not place orders with sufficient volume to qualify it for this discount. Two Imperial Clevite employees admitted at trial that Marco received the maximum volume discount even though it did not purchase the requisite volume (e.g., 20,000 feet of hose). Viewing the evidence most favorably to Diesel, the nondisclosure of Marco's receipt of maximum discounts to which it was not entitled certainly could be construed as a "secret" allowance. Further, these discounts could

also be construed as "unearned" discounts, since Marco did not properly "earn" them by ordering the requisite volume of Imperial Clevite products.[2] Thus, Diesel presented substantial evidence that could support a finding of the first element of section 17045.

The second element of "injury of a competitor" is similarly supported by substantial evidence. (§ 17045.) Diesel introduced testimony of Strachan and evidence of its financial performance which showed its gross sales and profits drastically declined from 1982 through 1985, the period during which Marco entered into competition with Diesel. Although all or part of the decline in Diesel's financial performance could possibly be attributed to factors other than Marco's presumably "unfair" competition through receipt of secret, unearned discounts, we cannot look to any contrary evidence in reviewing a nonsuit judgment and must look only to the evidence in support of Diesel's case. Accordingly, we must ignore Marco's contention that the general decline in the San Diego tuna industry and Diesel's own failure to compete were the actual reasons for Diesel's demise. Such evidence should only be considered by the jury in weighing whether there had been an "injury of a competitor" and not by the trial court in deciding a nonsuit motion.[3]

The third element is that the "allowance tends to destroy competition." (§ 17045.) The fact that Diesel's gross sales and profits declined and Diesel eventually was forced out of the market and closed down its operations provides evidence not only that the allowances to Marco "tended" to destroy competition, but actually did destroy competition. After the elimination of Diesel, the San Diego tuna industry was left with only one distributor of Imperial Clevite products, rather than the two distributors it had before. If when Marco was made a distributor of Imperial Clevite products it had been required to purchase products upon the same terms and conditions as Diesel, there presumably would have been healthy competition between the two distributors in the San Diego tuna industry. However, where one competitor

---

[2]The court's finding that Marco's discounts were not "unearned" because the Parent Company gave Imperial Clevite all of its subsidiaries' business is unsupported by Diesel's evidence when viewed most favorably to it. Further, such an argument would also fail for lack of proof that the discount Marco received was an appropriate measure of compensation for Marco giving Imperial Clevite all of its business. (*Texaco Inc.* v. *Hasbrouck* (1990) 496 U.S. 543, 562-571 [110 L.Ed.2d 492, 515-521, 110 S.Ct. 2535].) Finally, as we discuss below, Marco cannot "earn" the discount, as Marco suggests, through its indirect affiliation with another company that is an OEM.

[3]The trial court's finding there could be no "injury" to Diesel because it could have bought Imperial Clevite products at Marco's cost plus 10 percent is both illogical and an improper viewing of Diesel's evidence in considering a nonsuit motion. Accordingly, this finding provides no support for the court's nonsuit judgment.

is given a major pricing advantage over another competitor, such pricing discrimination has an inherent tendency to destroy competition. Given the legislative purpose of the Act is "to foster and encourage competition, by prohibiting unfair . . . and discriminatory practices" (§ 17001), we conclude Diesel presented substantial evidence which could support a finding that the allowance given Marco had a tendency to destroy competition.

IV

A.

■ Marco contends, however, that section 17045 does not apply to buyers who receive secret allowances of unearned discounts, but only to the sellers who provide them. Although there may be an argument for excepting an innocent, unknowing buyer from liability under section 17045 for secret, unearned discounts it received, this is not such a case.[4] Rather, in this matter, Marco proposed and actively solicited the favorable pricing scheme and Imperial Clevite accepted it. Marco was neither innocent, nor unknowing. It knew that other distributors purchased products based upon the list price schedule and the standard volume discounts on a per order basis. It knew other distributors did not receive the different (i.e., discriminatory) pricing that it received. Further, Marco did not disclose to Diesel that it was receiving the maximum volume discount even though it did not order the requisite volumes for such discount. In its successful attempt to obtain favorable pricing, Marco suggested the device that its orders be somehow considered part of the overall Parent Company structure and, in particular, its sister subsidiary, Marco Seattle, which is an OEM. As we discuss below, such a device is a mere pretext for obtaining an unearned discount.

Further, there is no public policy reason to exclude all buyers from section 17045 liability. One purpose of section 17045 is to foster competition by preventing or discouraging secret allowances of unearned discounts. In order to best fulfill this purpose, both sellers and buyers should generally be held

---

[4] If buyers are covered by section 17045, Marco asserts they should be liable only if they "knowingly" receive secret, unearned discounts. Marco appears to rely primarily upon section 2(f) of the Robinson-Patman Antidiscrimination Act (15 U.S.C. § 13(f)) as support for its contention "intent" is required under section 17045. That federal statute creates liability for buyers who "knowingly" receive discriminatory prices. (*Great A&P Tea Co.* v. *FTC, supra,* 440 U.S. at pp. 76-78 [59 L.Ed.2d at pp. 160-162].) However, that federal statute expressly contains the word "knowingly," whereas section 17045 contains no such express requirement of knowledge or intent. (15 U.S.C. § 13(f); § 17045.) Accordingly, in this respect the Act departs from the Robinson-Patman Antidiscrimination Act, and we conclude proof of a knowing or intentional receipt by a buyer of a secret, unearned discount is not required under section 17045.

liable in the event of such discounts. (*G.H.I.I.* v. *MTS, Inc., supra,* 147 Cal.App.3d at p. 271.) Finally, section 17045 does not expressly limit its provisions to cover only sellers. If the Legislature intended to so limit section 17045 liability, it could have easily indicated such intent. Accordingly, we reject Marco's contention it cannot be held liable under section 17045 since it is only a buyer.

### B.

■ Marco also contends the third element of a section 17045 violation (i.e., tendency to destroy competition) requires an "intent" on its behalf to destroy competition. The express terms of section 17045 contain no such requirement, and we decline to add such a requirement by implication. Section 17045 must be interpreted liberally in order to foster and encourage competition by prohibiting unfair and discriminatory practices. (§§ 17001, 17002.) In liberally interpreting section 17045 to discourage secret allowances of unearned discounts, we should not increase the plaintiff's burden by requiring proof of additional factors which the express terms of section 17045 do not require. Thus, we conclude section 17045 does not require proof of an "intent" to destroy competition, but only that the secret, unearned discount had a *tendency* to destroy competition.

### C.

■ Marco next contends it was not a distributor, but rather part of a conglomerate organization which included an OEM, and was therefore buying Imperial Clevite products on a negotiated or quoted OEM basis and not as a mere distributor buying off of the distributor price list. Such an argument is fact-based, so we must view the evidence in the light most favorable to Diesel and most strongly against Marco.

Section 17042, subdivision (c), allows price differences for products between customers "in different functional classifications." Accordingly, if Diesel's evidence, construed most favorably to it, conclusively shows Marco is in a different functional classification from Diesel, then a nonsuit judgment may have been proper. Two different functional classifications presumably are OEM'S and distributors. Marco purports its favorable pricing was a legitimate result of its association with Marco Seattle, an OEM, which negotiated special discounts for itself and Marco regardless of the volume ordered. Based upon the evidence Diesel presented and viewed most favorably to it, we conclude the evidence does not clearly show Marco was in a different functional classification from Diesel.

Imperial Clevite classified Marco as a distributor in its records, while classifying its sister company, Marco Seattle, as an OEM. A Marco employee testified Marco sold Imperial Clevite products to the tuna industry,

including boat owners, ship chandlers, management companies, and others. In fact, the court interrupted this testimony and stated: "In the interest of time, I understand from my discussion with the attorneys that there is no dispute about the fact that *each of the companies, [Diesel] and [Marco], were distributors* . . . ." (Italics added.) Thus, even the trial court appeared to acknowledge the evidence showed Marco was a distributor of Imperial Clevite products and was not in a different functional classification. Apparently, however, the court confused Marco with the other separate entities of the Parent Company organization, such as Marco Seattle. ■■■ ■ ■

■ The court concluded Diesel and Marco "were not purchasing [upon] like terms and conditions."[5] It appears the court placed Marco in a different functional classification merely because of an indirect affiliation with an OEM company. Based upon the evidence construed most favorably to Diesel, this was a misclassification and constituted error by the court. As separate entities who placed orders separately and received shipments at their geographically separate locations, Marco (Marco San Diego), a distributor, and Marco Seattle, an OEM should be treated as separate entities for purposes of pricing and section 17045 violations. Thus, Marco should not be allowed to create an illusion that it is part of its sister company, Marco Seattle, and obtain favorable discriminatory prices which other distributors in competition with it cannot obtain.

Marco points to the case of *Harris* v. *Capitol Records etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139], as support for its contention companies in different functional capacities can receive favorable pricing terms. However, that case is inapposite, as it primarily involves alleged violations of sections 17031, 17040, and 17043. (64 Cal.2d at pp. 457, 462.) Further, the alleged violation in that case involved just one corporation which acted primarily as a "rack-jobber" and only secondarily as a direct retail competitor. (*Id.* at pp. 456-457.) As a result, we see no precedential value in the *Harris* case. Yet, if anything, the case may tend to contradict Marco's argument. The court in dicta noted that the rack-jobber may have been more responsible than the record companies that sold to it, since the plaintiff's injury was caused "by [the rack-jobber's] *misuse of that classification* for [its] own ends." (*Id.* at p. 464, italics added.)

---

[5]Both the court and Marco appear to have assumed the phrase "purchasing upon like terms and conditions" contained in the language of section 17045 applies to secret allowances of unearned discounts. However, they cite no court decision holding this to be the proper interpretation of section 17045. Since section 17002 requires us to liberally construe section 17045 to serve its purposes, we conclude the phrase "purchasing upon like terms and conditions" does not apply to or otherwise qualify secret allowances of unearned discounts. Rather, the proper reading of that phrase and the entirety of section 17045 results in its application only to secret extensions of "special services or privileges not extended to all purchasers" who are "purchasing upon like terms and conditions." (§ 17045.)

Further, the United States Supreme Court essentially adopted the language of a report by a committee of the United States Attorney General regarding functional discounts which stated in part: " '[T]he law should tolerate no subterfuge. For instance, where a wholesaler-retailer *buys* only part of his goods as a wholesaler, he must not claim a functional discount on all. Only to the extent that a buyer *actually* performs certain functions, assuming all the risk, investment, and costs involved, should he legally qualify for a functional discount. Hence a distributor should be eligible for a discount corresponding to any part of the function he actually performs on that part of the goods for which he performs it.' [Citation.]" (*Texaco Inc.* v. *Hasbrouck, supra,* 496 U.S. at pp. 560-561 [110 L.Ed.2d at p. 514], italics in original, quoting Rep. of the Atty. Gen. Nat. Com. to Study the Antitrust Laws 208 (1955).) We similarly conclude Marco can only claim status as an OEM which is entitled to differential pricing to the extent it acts as such and uses the products for manufacturing purposes, and Marco cannot use such activities or some affiliation with another company that is an OEM (i.e., Marco Seattle) as a subterfuge or mere pretext to procure or avail itself of advantageous pricing over its fellow distributors that are in competition with it.[6]

### D.

Marco meritlessly contends there can be no violation of section 17045, because Imperial Clevite was merely "meeting the competition" when it gave Marco its favorable pricing and that this is a complete defense to a section 17045 violation. Since section 17045 contains no "meeting competition" defense and we decline to imply any such defense under these circumstances, Marco cannot rely upon such a defense, especially when we view the evidence most favorably to Diesel.

Two other unrelated sections of the Act, namely sections 17040 and 17050, contain explicit language which provides a "meeting competition" defense to violations of those sections. However, such defenses apply only to those particular sections and cannot be construed as applying to a section 17045 violation. Further, we conclude the Legislature, by express inclusion

---

[6]In a similar vein, Marco contended before the trial court, but apparently not here on appeal, that its discounts were exempt from section 17045 as mere interdivision transfers or transfers among subsidiaries. However, such contention is wholly unsupported by the record. Marco placed its orders directly with Imperial Clevite and received shipment at San Diego. There is no evidence showing Marco merely purchased products from the Parent Company or Marco Seattle and had the products delivered to it from Seattle at its expense. Even if it had, we doubt such device would be successful in avoiding section 17045 liability. (*Texaco Inc.* v. *Hasbrouck, supra,* 496 U.S. at pp. 560-561 [110 L.Ed.2d at pp. 513-514].)

of such a defense in sections 17040 and 17050, was aware of such a defense, and we infer the Legislature intended not to provide a "meeting competition" defense to a section 17045 violation, as it omitted any reference to that defense in that section's statutory language.

Although we conclude there exists no "meeting competition" defense to a section 17045 violation, we observe that in certain situations the meeting of a competitor's pricing may disprove the existence of one of the elements of a section 17045 violation. In particular, it is possible the element of a tendency to destroy competition may not exist if there is merely a legitimate meeting of a competitor's pricing. However, viewing Diesel's evidence most favorably to it, we conclude such an argument is not available to Marco. As we discussed above, Marco received secret allowances of unearned discounts which were not allowed its competing distributors. Accordingly, Imperial Clevite was not in any sense meeting a competitor's pricing to Marco as a distributor. Further, since Marco was not entitled to classification as an OEM for its purchases, it is entirely irrelevant if Imperial Clevite was meeting a competitor's pricing when it negotiated special prices for Marco Seattle as an OEM.

### E.

Finally, Marco contends application of section 17045 in this situation would constitute an unreasonable burden on interstate commerce. However, since the trial court did not base its ruling in any part upon this argument, we need not consider it in reviewing the court's grant of Marco's motion for a nonsuit. In any event, viewing Diesel's evidence most favorably to it, we see no merit in Marco's contention application of section 17045 would be unconstitutional in this context. Marco is a San Diego-based distributor who was competing with Diesel, another San Diego-based distributor, in the sale of Imperial Clevite products to the San Diego tuna industry. Except for the fact Imperial Clevite was located and manufactured those products outside of California, this case is essentially an intrastate matter, and any interstate connection is minor in comparison to California's prevailing public policy interest in preventing unfair trade practices. As a result, we conclude application of section 17045 to the facts in this matter would not constitute an unreasonable burden on interstate commerce.

### V

Diesel also contends the court erred in excluding all testimony by its damages expert. The court, in excluding the testimony of Brian Brinig, stated: *"There is also a causation problem. The evidence shows that the tuna*

industry in San Diego dried up starting in '82. Your own witness, your client has testified that he concentrated more on the repair business rather than upon the sale of hose. He's also testified that he could have purchased from Marco at cost plus 10 percent and he chose not to do so. *All of these factors would make the expert's testimony specious, speculative and without foundation.*" (Italics added.) Thus, the court appeared primarily concerned that expert testimony on damages would prove nothing, as Diesel's declining performance could be attributed to other factors, such as the general decline of the tuna industry. However, such concerns should not preclude the introduction by Diesel of any evidence as to damages. Rather, Diesel's evidence should have been admitted, and then Marco would have the opportunity to counter it by introducing evidence of other factors that could have caused Diesel's decline. As one court stated: "While, similar to other cases, damages cannot be awarded in antitrust cases upon sheer guesswork or speculation, the plaintiff seeking damages for loss of profits is required to establish only with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of the anticipated revenue [citation]. Once that has been accomplished, the jury will be permitted to act upon probable and inferential proof and to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' [Citation.]" (*Suburban Mobile Homes, Inc.* v. *AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545 [161 Cal.Rptr. 811].) The trial court in this matter appeared to confuse the causation of antitrust injury with proof of the amount of damages. By establishing a prima facie case of a section 17045 violation, Diesel had presented substantial evidence of antitrust injury. Diesel showed its gross sales drastically declined and profits fell after Marco entered the market and received secret, unearned discounts. Further, Diesel introduced the testimony of two customers who chose to do business with Marco rather than Diesel due to Marco's lower pricing. Such evidence is sufficient to show causation of antitrust injury. Although a plaintiff must show actual injury of the type antitrust laws were intended to prevent and show some causal connection between the price discrimination and the injury, we must follow the " 'traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury.' " (*Texaco Inc.* v. *Hasbrouck, supra,* 496 U.S. at p. 573 [110 L.Ed.2d at p. 522], quoting *J. Truett Payne Co.* v. *Chrysler Motors Corp.* (1981) 451 U.S. 557, 562 [68 L.Ed.2d 442, 448, 101 S.Ct. 1923].) Further, we adopt the often-repeated reasoning of the United States Supreme Court as to proof of damages in antitrust cases, as follows: "[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and

reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.' " (*Zenith Corp.* v. *Hazeltine* (1969) 395 U.S. 100, 123-124 [23 L.Ed.2d 129, 148, 89 S.Ct. 1562], quoting *Bigelow* v. *RKO Radio Pictures* (1946) 327 U.S. 251, 264 [90 L.Ed. 652, 660, 66 S.Ct. 574].) Based upon the evidence of antitrust injury presented by Diesel, there was a sufficient basis for its expert to testify as to damages resulting from the alleged violation of section 17045. Accordingly, the court erred in excluding such expert testimony.

## Disposition

The judgment is reversed, and the cause remanded for further proceedings consistent with this opinion. Diesel to recover its costs of this appeal.

Kremer, P. J., and Huffman, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 22, 1993.