AMERICAN BOOKSELLERS ASSN., INC., et al., Plaintiff,

v.

BARNES & NOBLE, INC., et al., Defendants.

No. C–98–1059 WHO.

United States District Court, N.D. California.

March 19, 2001.

Douglas R. Young, Farella, Braun & Martel, San Francisco, CA, Jerald A. Jacobs, David W. DeBruin, Bruce V. Spiva, Jenner & Block, Washington, DC, for Plaintiff.

Melvin R. Goldman, Penelope A. Preovolos, Judson Lobdell, Morrison & Foerster, San Francisco, CA, Daniel M. Petrocelli, David R. Garcia, Alan Rader, O'Melvany & Myers, Los Angeles, CA, Margot J. Metzger, Robinson Silverman Pearce Aronsohn & Berman, New York, NY, for "Barnes & Noble" Defendants.

Reginald D. Steer, Andrew D. Mastin, Richard J. Nelson, Skjerven, Morrill, Mac-Pherson, Franklin & Friel, San Francisco, CA, Paul R. Griffin, Pillsbury Winthrop LLP, San Francisco, CA, for "Borders" Defendants.

## OPINION AND ORDER

ORRICK, District Court.

In this antitrust action brought by the American Booksellers Association on behalf of all California members ("ABA") and twenty-seven independent bookstores[1] against various defendants associated with Barnes & Noble, Inc. ("the Barnes & Noble defendants")[2] and Borders Group, Inc. ("the Borders defendants")[3], three motions are currently before the Court. The Barnes & Noble defendants move for summary judgment, and the Borders defendants join in that motion. The Borders defendants, joined by the Barnes & Noble defendants, move for partial summary adjudication with respect to distribution center discounts, the statistical reserve program, and cooperative advertising allowances for placement. Plaintiffs move for partial summary judgment on defendants' "no harm to competition" and functional discount defenses.

---

1. Book House of Stuyvesant Plaza, Inc.; The Book Shop, Inc.; The Book Stall at Chestnut Court, Inc.; Book Soup, Inc.; B & R Books, Inc., dba Little Professor Book Center, Charlotte; Changing Hands Bookstore, Inc.; Cody's Books, Inc.; College Book Company of San Antonio, Inc., dba The Twig, Booksmith of San Antonio and Red Balloon Children's Book Store; Books by Mail, LLC; Copperfield's Books, Inc. and Petaluma Gold, dba Copperfield's Books; Dutton's Brentwood Books, Inc.; Edward B. Elrod, sole proprietor and successor in interest, dba Ventura Book Store; Elliott Bay Book Company, a corporation; Third Place Company LLC, dba Elliott Bay Book Company; The Happy Bookseller; Inkwood, Inc., dba Inkwood Books; Kepler Corporation, dba Kepler's Books & Magazines; Ketterson's Old Market Bookstore; Left Bank Books Inc.; Lemuria, Inc.; Midnight Special Bookstore, Inc.; Our Gang, Inc., dba Freddy's Feed and Read; Sam Weller's Books, Inc., dba Sam Weller's Zion Bookstore; Tattered Cover, Inc.; The Squirrel Hill Bookstore; Thunderbird Bookshops, Inc.; Tiger & Company, Inc., dba Chapters: A Literary Bookstore; and Women & Children First, Inc.

2. The "Barnes & Noble defendants" are Barnes & Noble, Inc.; Barnes & Noble Booksellers, Inc.; B. Dalton Bookseller, Inc.; Doubleday Book Shops, Inc.; Marboro Books Corp.; Barnesandnoble.com LLC; and Barnes & Noble Online, Inc.

3. The "Borders" defendants are Borders Group, Inc.; Borders, Inc.; Walden Book Company, Inc.; Borders Online, Inc.; Borders Fulfillment, Inc.; and The Library, Ltd.

For the reasons set forth below, the motions are granted in part, and denied in part.

## I.

In this action, the ABA and twenty-seven independent bookstores allege that defendants receive secret discounts and other favorable terms from book publishers and distributors that are not available to independent bookstores. Plaintiffs contend that these practices harm competition in the book industry, and violate the Robinson–Patman Act (15 U.S.C. § 13(f)), the California Unfair Trade Practices Act (Cal. Bus. & Prof.Code § 17045 *et seq.*), and the California Unfair Competition Law (Cal. Bus. & Prof.Code § 17200 *et seq.*).

## II.

The Court will begin with the motion for summary judgment filed by the Barnes & Noble defendants, and joined in by the Borders defendants. In that motion, defendants move for summary judgment on all of plaintiffs' claims against them, on various grounds.

Defendants' first argument is that plaintiffs cannot show that any of the discounts received by defendants caused any actual injury to any of the individual plaintiffs. This argument is directed primarily at the economic model constructed by plaintiffs' expert, Dr. Franklin Fisher ("Fisher"), although defendants also contend that plaintiffs have no other evidence of causation.

Defendants' second argument is that plaintiffs cannot show that the retail distribution center ("RDC") discounts received by defendants violate the Robinson–Patman Act. Defendants argue that plaintiffs cannot show that the RDC discounts are not lawful functional discounts, or that defendants knew that they were not lawful functional discounts. Defendants also argue that plaintiffs cannot show that the RDC discounts are not cost-justified, or that defendants knew that they were not cost-justified.

Defendants' third argument is that plaintiffs cannot show that the discounts and incentives granted to defendants by Ingram Book Company ("Ingram") were not cost-justified, or that defendants knew that they were not cost-justified.

Defendants' fourth argument is that plaintiffs cannot assert a claim against them for receipt of discriminatory promotional allowances, as a matter of law. In the alternative, defendants argue that plaintiffs cannot show that the promotional allowances were not lawful functional discounts, or that defendants knew that they were not lawful functional discounts.

Defendants' fifth argument is that plaintiffs cannot show that defendants received unlawful discriminatory credit terms, or that defendants knew that they received unlawful discriminatory credit terms.

Defendants' sixth argument is that summary judgment should be granted in favor of defendants' Internet and mail order defendants because plaintiffs cannot prove causation or damages with respect to those defendants.

Defendants' seventh argument is that summary judgment should be granted for defendants with respect to the other alleged discounts not addressed in their motion for summary judgment because those discounts are relatively so small that they could not have caused antitrust injury or damage to plaintiffs.

## A.

The Court will begin its analysis by reviewing the elements of a claim for violation of the Robinson–Patman Act. Under the Robinson–Patman Act, it is

unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]

15 U.S.C. § 13(a) (Robinson–Patman Act § 2(a)). The Robinson–Patman Act also prohibits buyers from receiving or inducing price discrimination from sellers. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. 13(f) (Robinson–Patman Act § 2(f)). In this case, plaintiffs contend that the Barnes & Noble and Borders defendants violated § 2(f) by knowingly receiving unlawful discounts from book publishers.

An action for damages for violation of the Robinson–Patman Act is set forth in 15 U.S.C. § 15.

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

*Id.*

"[B]uyer liability under § 2(f) is dependent on seller liability under § 2(a)." *Great Atlantic & Pac. Tea Co. v. FTC,* 440 U.S. 69, 77, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). "Under the plain meaning of § 2(f), therefore, a buyer cannot be liable if a prima facie case could not be established against a seller or if the seller has an affirmative defense." *Id.* at 76, 99 S.Ct. 925.

■ Thus, in order to obtain damages for violation of § 2(f) of the Robinson–Patman Act, each plaintiff must show:

1. Two or more contemporaneous sales by the same seller to the plaintiff and a competing buyer;

2. At different prices;

3. Of commodities of like grade and quality;

4. Where at least one of the sales was made in interstate commerce;

5. The price discrimination had the requisite effect upon competition generally;

6. The competing buyer knew the price discrimination was unlawful; and

7. The price discrimination caused injury to the plaintiff. *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 677 (9th Cir.1975) (citations omitted); *Automatic Canteen Co. of Am. v. FTC,* 346 U.S. 61, 73, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). Each plaintiff seeking damages must make "some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Each such plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered." *Id.* (quoting *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969)).

■ In order to obtain an injunction for violation of § 2(f) of the Robinson–Patman Act, each plaintiff does not need to prove

that it was actually injured by the unlawful price discrimination. Instead, the plaintiffs must show only that there is a reasonable possibility that the price discrimination may harm competition; this reasonable possibility of harm is referred to as "competitive injury." *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983). Competitive injury "is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Id.* at 435, 103 S.Ct. 1282. "[T]his inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." *Id.* "Unless rebutted by one of the Robinson–Patman Act's affirmative defenses, a showing of competitive injury as part of a prima facie case is sufficient to support injunctive relief, and to authorize further inquiry by the courts into whether the plaintiff is entitled to treble damages[.]" *Id.*

### B.

Defendants' first argument is that plaintiffs cannot show that any price discrimination received by defendants caused actual injury to plaintiffs, other than through a defective economic model constructed by plaintiffs' expert, Dr. Franklin M. Fisher (the "Fisher model"). Defendants contend that the Fisher model is fatally flawed in numerous ways.

Plaintiffs have previously informed the Court that "[p]laintiffs' proof of actual injury attributable to the defendants' conduct will be presented through a single expert witness, Dr. Franklin Fisher, who will present an economic simulation model that automatically accounts for individualized events and factors that affected the plaintiff bookstores during the complaint period." (Summ. of Argument and Evidence Re: Pls.' Mem. in Opp'n to Defs.' Joint Notice of Mot. and Mot. for Severance of the Eight California Pls. and the American Booksellers Association, filed Oct. 26, 2000, at 3.)

#### 1.

Defendants' argument that the Fisher model is inadequate to prove actual injury to the individual plaintiffs provides no support for granting summary judgment on plaintiffs' claim for injunctive relief under the Robinson–Patman Act.

Claims for injunctive relief are governed by 15 U.S.C. § 26, which provides, in relevant part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity[.]

As the Court has already noted, plaintiffs do not have to show that they suffered actual injury in order to obtain injunctive relief under the Robinson–Patman Act. Instead, plaintiffs must show only that there is a reasonable possibility that the unlawful price discrimination received by defendants *may* harm competition. *Falls City*, 460 U.S. at 434–45, 103 S.Ct. 1282. Defendants do not address this test in their motion for summary judgment. Thus, defendants' motion for summary judgment is denied with respect to plaintiffs' claim for injunctive relief.

#### 2.

The Court turns to plaintiffs' claims for damages under the Robinson–Patman Act, which do require a showing of actual inju-

ry. *J. Truett Payne*, 451 U.S. at 562, 101 S.Ct. 1923. In analyzing the Fisher model, the Court will keep in mind the "'traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury.'" *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 573, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) (quoting *J. Truett Payne*, 451 U.S. at 565, 101 S.Ct. 1923).

Defendants contend that the Fisher model ignores the requirements that each defendant and each plaintiff make reasonably contemporaneous purchases of like grade and quality from the same seller at different prices. It is important to note that defendants do *not* move for summary judgment on these elements of a Robinson–Patman Act claim. Rather, defendants contend that Fisher's failure to take these elements into account in constructing his model makes his conclusion that the discounts received by defendants harmed plaintiffs, as well as his conclusions about the amount of damages suffered by the plaintiffs, fatally flawed.

The Fisher model compares an average differential calculated from the actual prices defendants paid for books from twenty-seven publishers and three wholesalers against the terms set forth in an annual buyer's guide entitled the "ABA Book Buyer's Handbook" (which the parties also refer to as the "Redbook"). (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 11 ¶ 24 and 12 ¶ 27.) Fisher assumes that plaintiffs will testify that they purchase books pursuant to the discount schedules in the Redbook. (*Id.* at 12 ¶ 27.) Thus, although the Fisher model takes into account actual prices that defendants paid to certain publishers and wholesalers, it does not take into account actual prices plaintiffs paid to publishers and wholesalers. (Lobdell Decl. Ex. W, Fisher Dep. at 273:16–274:5.)

As Fisher concededly made no effort to base his model on actual purchasing data from plaintiffs, his model makes no attempt to determine the actual prices paid by defendants and plaintiffs for the same books from the same publishers at reasonably contemporaneous times. Rather, it assumes that plaintiffs and defendants bought books from the same publishers at reasonably contemporaneous times, and that the Redbook price was in effect at all times with respect to all of plaintiffs' purchases. Fisher also assumes that

> the Plaintiffs are buying from a group of—buying a set of books that overlaps or is substitutable for the books that Barnes & Nobles buys and then resells, so that we can treat these ... of like grade and quality. They don't have to be the same books. They don't even have to be from the same publisher.

(Lobdell Decl. Ex. W, Fisher Dep. at 270:10–17.)

Under the Federal Rules of Evidence, Fisher is permitted to base his expert opinion on evidence that will be proved by other witnesses at trial. Fed. R.Evid. 703 ("The facts or data in the particular case upon which an expert bases his opinion or inference may be those perceived by or made known to the expert at or before the hearing."); *id.* 1972 Advisory Committee Notes ("Facts or data upon which expert opinions are based may, under the rule, be derived from ... presentation at the trial[.]").

Plaintiffs have submitted deposition testimony from the plaintiff bookstores, in which they attest that they sometimes refer to the Redbook, but also purchase books pursuant to special seasonal discounts that are offered to all retailers. (*See, generally*, DeBruin Decl. Ex. 2.) Some of the plaintiff bookstores, however, buy some, but not all, of their books pursuant to lower RDC discounts. (*See, e.g.*,

Lobdell Decl. Ex. II, Meskis Dep. at 428:11–18; *id.* Ex. DD, Kepler Dep. at 146:18–24, 147:10–12.) From this evidence, it is clear that Fisher's assumption that all plaintiffs purchase all of their books pursuant to the terms set forth in the Redbook is not justified.

Plaintiffs have submitted declarations from the plaintiff bookstores, in which they attest in detail that they frequently and regularly purchase books from the same twenty-seven publishers and three wholesalers from which defendants purchase books. (*See* DeBruin Decl. Ex. 1.) It also appears to be undisputed that defendants purchase nearly every book that is available on the market. Pamela Bryant of Barnes & Noble testified at deposition that "[c]urrently, we stock every title a publisher has to offer." (DeBruin Decl. Ex. 30, Bryant Dep. at 88:17–18.) Roger Stefanski of Borders testified at deposition that "Borders is buying virtually everything in the catalog in order to give the customer the widest possible selection." (Hohengarten Decl. Accompanying Notice of Errata Ex. 51, Stefanski Decl. at 32:9–11.) The trier of fact could reasonably conclude from this evidence that plaintiffs and defendants make reasonably contemporaneous purchases from the same sellers.

There is also evidence that publishers offer standardized discounts on entire lines of books, such as discounts on all trade book or mass market books, rather than offering individualized discounts on specific titles. (DeBruin Decl. Ex. 13, Expert Report of Gail See at 4.) Defendants do not appear to dispute that they receive discounts that are not available to plaintiffs. The trier of fact could infer from this evidence that plaintiffs and defendants must have contemporaneously bought books of like grade and quality from the same sellers at different prices. There is no need to show that each plaintiff bought a specific title at a greater price than that paid by defendants for the same title at the same time. *See, e.g., Moog Indus., Inc. v. FTC,* 238 F.2d 43, 49–50 (8th Cir. 1956) (where uniform discounts were given across entire lines of automobile parts, it was not necessary to show that the parties purchased the exact same part at the same time, even though the parts were not interchangeable).

### 3.

Defendants also correctly point out that the Fisher model fails to even try to show that any discounts defendants received from any individual publisher caused injury to any plaintiff. Instead, the Fisher model uses an average price differential that averages the discounts defendants receive from all publishers and wholesalers for each year, and uses that number to demonstrate injury to plaintiffs and the damages plaintiffs allegedly suffered. (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 11 ¶ 24 and 12 ¶ 27; Lobdell Decl. Ex. W, Fisher Dep. at 245:4–249:4, 265:16–25.) By using this average differential, the Fisher model fails to even attempt to show that defendants' receipt of a discount from any particular publisher caused injury to any plaintiff.

"[B]uyer liability under § 2(f) is dependent on seller liability under § 2(a)." *Great Atlantic,* 440 U.S. at 77, 99 S.Ct. 925 (footnote omitted). Each plaintiff " 'must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered.' " *J. Truett Payne,* 451 U.S. at 562, 101 S.Ct. 1923 (quoting *Perkins,* 395 U.S. at 648, 89 S.Ct. 1871). Plaintiffs have cited no law that permits them to average the effects of the purportedly unlawful acts of many publishers and wholesalers in order to show that, on average, plaintiffs were harmed by defendants' receipt of the benefit of those violations. Because the

Fisher model fails to show that discounts received by defendants from any particular publisher or wholesaler harmed any of plaintiffs, the Fisher model fails to show that any publisher's discounts to defendants caused any actual harm to plaintiffs.

4.

Defendants also contend that the Fisher model is fatally flawed because it contains no empirical data or analysis to support many of its key assumptions.

Defendants are correct that the Fisher Model does not take into account the costs of the publishers and wholesalers. The Fisher Model assumes that the entire difference between the discounts granted to plaintiffs and the discounts granted to defendants is unlawful. (Lobdell Decl. Ex. W, Fisher Dep. at 53:14–54:1.) It makes no allowance for the possibility that the additional discounts granted to defendants may be functional discounts or are cost-justified in light of the publishers' costs, because Fisher was asked to assume that the entire price differential between defendants and plaintiffs was illegal. (*Id.*) Thus, depending upon whether any of the publishers' or wholesalers' discounts actually are cost-justified or functional discounts, the Fisher model may overstate the actual unlawful price differential between the prices paid by defendants and the prices paid by plaintiffs. As a result, the damage calculations are completely speculative.

Defendants are also correct that the Fisher model fails to take into account the actual retail pricing policies of plaintiffs or defendants and, thus, fails to show that any discounts received by defendants were passed on to consumers. Rather, it simply assumes that prices will be set in a way that maximizes profits. (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 64 ¶ 175.) By failing to determine whether any of the discounts received by defendants actually are passed

on to consumers in the form of lower prices, the Fisher model fails to show that those discounts caused any harm to plaintiffs.

Defendants also complain that the Fisher model fails to determine the relevant geographic markets in enough detail. The Fisher model does attempt to take into account the competition among plaintiffs, defendants, and other bookstores in specific geographic markets. It generally assumes that plaintiffs compete with other bookstores in the same city, or in some instances the same county or metropolitan area. (*Id.* at 66 ¶ 184.) The model also takes into account testimony from certain plaintiffs that they compete with certain of defendants' stores that are not in the same city or county, but are still nearby. (*Id.;* Lobdell Decl. Ex. W, Fisher Dep. at 202:11–20.) Defendants are correct, however, that the Fisher model does not attempt to measure the actual extent to which stores in the same area compete with each other, or to determine, for instance, whether there are natural barriers such as highways or rivers between stores in the same city that might reduce the degree to which they compete. (*See, e.g.,* Lobdell Decl. Ex. W, Fisher Dep. at 123:7–19.) Thus, the Fisher model may over or underestimate the actual degree to which the stores compete, and this potential error may also affect the damage calculations.

The Fisher model also assumes that plaintiffs and defendants are general book stores, and that they compete only with each other. (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 64 ¶ 185 and n.94.) The Fisher model thus ignores competition from Internet booksellers, and competition from booksellers who are not general book stores (such as specialty bookstores, price clubs, department stores, etc.). The Fisher model thus artifi-

cially limits the relevant market in which plaintiffs and defendants compete.

Defendants also correctly note that the Fisher model uses arbitrary retention ratios to determine the extent to which plaintiffs' and defendants' sales are affected by price changes. At deposition, Fisher acknowledged that he arbitrarily set the retention ratios at 0.5, without attempting to determine what those ratios actually were in the real world. (Lobdell Decl. Ex. W, Fisher Dep. at 316:1–10, 322:6–10.)

The Fisher model also assumes that the sales that defendants would lose once their unlawful discounts were eliminated would go to plaintiffs and other bookstores in direct proportion to their share of the general bookstore market. (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 66–67 ¶ 186.) This assumption disregards other factors that may affect the distribution of defendants' lost sales, such as the distance between defendants' stores and their competitors.

The Fisher model also calculates damages up through the present day for five of the plaintiffs that closed during the complaint period, but Fisher admitted at deposition that he made no attempt to determine whether those stores closed because of competition from defendants. (Lobdell Decl. Ex. W, Fisher Dep. at 163:17–164:24.) Fisher admitted that if those stores went out of business for reasons that had nothing to do with defendants, damages should not be awarded for the years after they closed. (*Id.* at 166:17–25.)

■ Damages in antitrust cases do not have to be calculated with certainty. " '[D]amages issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.' " *Hasbrouck*, 496 U.S. at 573 n. 31, 110 S.Ct. 2535 (quoting *J. Truett Payne*, 451 U.S. at 565–66, 101 S.Ct. 1923 (quoting *Bigelow v. RKO Pic-*

*tures Inc.*, 327 U.S. at 264, 66 S.Ct. 574)). "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne*, 451 U.S. at 567, 101 S.Ct. 1923. The wrongdoer cannot "insist upon specific and certain proof of the injury which it has itself inflicted." *Id.*

On the other hand, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). One of the factors the Court must consider in determining whether to admit expert testimony is whether it " 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). "A court may conclude that there is simply too great an analytic gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). " '[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' " *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Joiner*, 522 U.S. at 146, 118 S.Ct. 512).

■ The Fisher model contains entirely too many assumptions and simplifications that are not supported by real-world evidence. As a result, its conclusions that the discounts defendants received caused actu-

al injury to the individual plaintiffs, and the amount of damages caused by that injury, are entirely too speculative to support a jury verdict. *See, e.g., McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 807–08 (9th Cir.1988) (affirming summary judgment for the defendants because district court properly excluded "hopelessly flawed" damages studies that rested "on unsupported assumptions"); *City of Vernon v. Southern California Edison Co.,* 955 F.2d 1361, 1371–73 (9th Cir.1992) (affirming summary judgment for the defendant where the plaintiff submitted flawed damages model); *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1055–1057 (8th Cir.2000) (finding that expert testimony in antitrust case should have been excluded because it did not incorporate all relevant circumstances, ignored inconvenient evidence, and did not separate lawful from unlawful conduct); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) (affirming exclusion of expert testimony in antitrust case because it made unsupported assumptions about elasticities of demand in various markets, and ignored the impact of other dominant forces in the relevant market).

Plaintiffs cannot prove causation of actual injury without Fisher's expert testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors. Accordingly, defendants' motion for summary judgment on plaintiffs' claims for damages under the Robinson–Patman Act[4] is granted.

### 5.

Even if the Fisher model were admissible to show causation of the individual plaintiffs' alleged injuries, the Internet and mail order defendants would still be entitled to summary judgment on plaintiffs' damages claims under the Robinson–Patman Act. The Fisher model relies entirely upon competition between plaintiffs' and defendants' physical stores in the same geographic location. It expressly does not purport to address competition between plaintiffs and defendants' Internet sales and mail order sales subsidiaries. (DeBruin Decl. Ex. 10, Fisher Decl. Ex. A (Fisher Expert Report) at 16 ¶ 32.) The Fisher expert report states:

> Documents produced by defendants show that defendants received favorable discounts on purchases of books for resale through the Internet and for customer special orders. However, at the time of writing this report, there was not sufficient information to quantify price differentials resulting from this term of sale and they are omitted from the analysis.

*(Id.)* (footnote omitted). The Internet and mail order defendants are Marboro Books Corp., Barnes & Noble Online, Inc., barnesandnoble.com llc, barnesandnoble.com, inc., and Borders Online, Inc. As plaintiffs concededly have no evidence to show that they were injured by differential discounts received by defendants' Internet and mail order subsidiaries, summary judgment is granted for those defendants on plaintiffs' claims for damages under the Robinson–Patman Act, even if the Fisher model were otherwise admissible to prove causation.

### 6.

This ruling does not preclude the Fisher model from being used for other purposes at trial. Although the Fisher model cannot be used to show causation of actual

---

4. The Court need not and does not reach defendants' additional argument that the Fisher model bases 87 percent of its damages on a legally impermissible causation and damages theory.

injury to plaintiffs, its detailed calculations of the discounts received by each defendant may well be admissible to prove defendants' liability on plaintiffs' claim for injunctive relief under the Robinson–Patman Act, which does not require a showing of actual harm to each plaintiff.

### 7.

Defendants also move for summary judgment on plaintiffs' state law claims for violation of the California Unfair Practices Act (Cal. Bus. & Prof.Code § 17045), and the California Unfair Competition Law (Cal. Bus. & Prof.Code § 17200 *et seq.*). Defendants contend that plaintiffs' inability to prove causation of actual injury to the individual plaintiffs through the Fisher model also requires that summary judgment be granted for defendants on the state law claims.

### a.

■ Section 17045 provides:

The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

Cal. Bus. & Prof.Code § 17045.

Section 17045 prohibits sellers from giving secret discounts to certain purchasers when the discount "injures a competitor *and* tends to destroy competition." *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.*, 14 Cal.4th 1247, 1256, 61 Cal.Rptr.2d 112, 116, 931 P.2d 290 (1997) (emphasis added); *see also Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal.App.4th 202, 20 Cal. Rptr.2d 62 (1993) (element of "injury to a competitor" is met when plaintiff demonstrates that it lost sales and profits as a result of the defendants' unlawful conduct).

Defendants contend that plaintiffs cannot show that the discounts defendants receive have a tendency to destroy competition. In *Diesel Electric*, however, the court held that "where one competitor is given a major pricing advantage over another competitor, such pricing discrimination has an inherent tendency to destroy competition." 16 Cal.App.4th at 213–14, 20 Cal.Rptr.2d at 68. As defendants do not dispute that they received discounts that were not available to plaintiffs, defendants' motion for summary judgment cannot be granted on this argument.

For the reasons set forth above in the discussion of the Robinson–Patman Act claim, however, plaintiffs cannot show that they suffered actual injury as a result of defendants' receipt of allegedly unlawful discounts from publishers. Thus, they cannot show the "injury to a competitor" element of their claim for violation of § 17045, either. Accordingly, summary judgment is granted for defendants on plaintiffs' claim for violation of § 17045 of the California Business and Professions Code.

### b.

■ Section 17200 of the California Business and Professions Code defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. By proscribing any unlawful business practice, § 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal. Rptr.2d 548, 561, 973 P.2d 527 (1999). Section 17200, however, also prohibits unfair or fraudulent business practices, even

if those practices are not specifically made unlawful by some other law. *Id.*

Plaintiffs' claim for violation of § 17200 is based on both unlawful and unfair business practices. (Second Am. Compl. ¶¶ 122–126.) Plaintiffs allege that the differential discounts received by defendants are unlawful because they violate the Robinson–Patman Act, the California Unfair Practices Act, and § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). (Second Am. Compl. ¶ 123.) Plaintiffs also contend that the discounts are unfair, within the meaning of § 17200, because they are harmful to plaintiffs, harmful to consumers, and harmful to competition. (*Id.* ¶ 124.)

Defendants move for summary judgment on the § 17200 claim on the sole ground that plaintiffs cannot state a claim for violation of the Robinson–Patman Act or the Unfair Practices Act. As plaintiffs' claim for injunctive relief under the Robinson–Patman Act has survived defendants' motion for summary judgment, their § 17200 claim necessarily survives as well. Defendants' motion for summary judgment on plaintiffs' claim for violation of § 17200 is denied.

### III.

Defendants also move for summary judgment as to whether plaintiffs can show that certain discounts defendants receive violate the Robinson–Patman Act. Before the Court can rule on this part of their motion, however, it must decide two other related motions for summary judgment filed by the Borders defendants and by plaintiffs.

The Borders defendants, joined by the Barnes & Noble defendants, move separately for partial summary judgment, arguing that plaintiffs cannot challenge the RDC discounts received by defendants, the discounts they received in the Return of Goods program, or the amount of cooperative advertising funds they received for product placement. The Borders defendants contend that plaintiffs are collaterally and judicially estopped from arguing that these discounts are unlawful because plaintiffs signed consent decrees with publishers in prior litigation that expressly approved the same discounts that are at issue in this lawsuit.

Plaintiffs also move for summary judgment on defendants' claim that the RDC discounts they receive are lawful functional discounts. Plaintiffs argue that, as a matter of law, functional discounts are available only to wholesalers. Plaintiffs contend that defendants are retailers, not wholesalers and, thus, as a matter of law, cannot claim to be receiving functional discounts.

The Court will begin with the Borders' defendants motion for partial summary judgment, joined by the Barnes & Noble defendants.

### A.

In 1994, the ABA and five independent booksellers ("the New York plaintiffs")—Dickens Books Ltd. d/b/a Harry W. Schwarz Bookshops; B & R Books, Inc. d/b/a Little Professor Book Center ("B & R"); Olsson Enterprises, Inc.; Sam Weller's Zion Book Stores, Inc. ("Sam Weller"); and Tattered Cover, Inc. ("Tattered Cover")—sued a number of publishers in the Southern District of New York for violating the Robinson–Patman Act.[5]

The publisher defendants were Penguin Books USA Inc. ("Penguin"), Rutledge Hill Press, Inc. ("Rutledge Hill"), Hugh Lauter Levin Associates, Inc. ("Levin"),

---

**5.** The ABA, B & R, Sam Weller and Tattered Cover are also plaintiffs in the current action.

St. Martin's Press, Incorporated ("St.Martin's") and Houghton Mifflin Company, Inc. ("Houghton Mifflin"). The case was entitled *American Booksellers Association v. Houghton Mifflin Co.*, No. 94 CIV 8566(JFK). The action was resolved by a series of consent orders stipulated to by the parties and entered by the Southern District of New York.

In 1996, the same plaintiffs plus The Happy Bookseller[6] ("the Happy New York plaintiffs") sued Random House, Inc. and certain of its subsidiaries[7] ("Random House") in the Southern District of New York for violating the Robinson–Patman Act. The case was entitled *American Booksellers Association v. Random House, Inc.*, No. 96 Civ. 0030(JFK). The action also was resolved by a consent order stipulated to by the parties and entered by the Southern District of New York.

The consent orders in both cases are attached as Exhibits 1 through 11 to the declaration of Bruce V. Spiva in support of plaintiffs' opposition to defendants' motions for summary judgment ("Spiva Decl."). The Court will refer to both cases jointly as the "New York publisher lawsuits." Borders argues that the doctrines of collateral estoppel (also known as "issue preclusion") and judicial estoppel preclude plaintiffs from relitigating the legality of discounts that plaintiffs approved in the consent orders entered in the New York publisher lawsuits.

### B.

### 1.

■ The general rule is that collateral estoppel or issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment. *Arizona v. California*, 530 U.S. 392, 120 S.Ct. 2304, 2319, 147 L.Ed.2d 374 (2000) (quoting Restatement (Second) of Judgments § 27 at 250 (1982)). In the case of a judgment entered by consent, none of the issues is actually litigated. *Id.* Thus, settlements ordinarily occasion no collateral estoppel unless it is clear that the parties intend their agreement to have such an effect. *Id.* " 'In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented.' " *Id.* (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4443 at 384–85 (1981)). *See also Green v. Ancora–Citronelle Corp.*, 577 F.2d 1380, 1383 (9th Cir.1978) ("The fact that this judgment was the result of the parties' stipulation of settlement does not detract from its being considered a conclusive determination of the merits of that action for purposes of collateral estoppel where, as here, it is clear that the parties intended the stipulation of settlement and judgment entered thereon to adjudicate once and for all the issues raised in that action.")

Thus, under the general rule, the consent orders in the New York publisher lawsuits resolved the claims between the plaintiffs in those lawsuits and the publisher defendants, but the consent orders created no issue preclusion in the instant lawsuits unless the parties clearly intended their agreement to have such an effect.

### 2.

■ "Judicial estoppel, sometimes also known as the doctrine of preclusion of

---

**6.** The Happy Bookseller is also a plaintiff in the current action.

**7.** The subsidiaries were Crown Publishing, Inc., Alfred A. Knopf, Inc., Random House Value Publishing, Inc., Clarkson N. Potter, Inc., and Fodor's Travel Publications, Inc.

inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996). Judicial estoppel is an equitable doctrine invoked by a court at its discretion to protect against a litigant playing fast and loose with the courts. *Id.* at 601 (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990)). "If a litigant's current position is manifestly inconsistent with a prior position such as to 'amount to an affront to the court, judicial estoppel may apply.'" *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 235 F.3d 1184, 1190 (9th Cir.2000) (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 362–63 (3d Cir.1996)).

"[T]he doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation." *Rissetto,* 94 F.3d at 605.

### C.

### 1.

On October 30, 1995, the New York plaintiffs and Houghton–Mifflin entered into a Consent Order. (Spiva Decl. Ex. 1 at 11.) That Consent Order was amended and superseded by a First Amended Consent Order on September 23, 1998. (*Id.* Ex. 2 at 2, 6.)

The original Consent Order set forth a set of Rules for Application of the Robinson–Patman Act to Book Publishing. (Spiva Decl. Ex. 1 at Ex. A.) It also set forth a list of approved discounts that the parties agreed complied with the Robinson–Patman Act. (*Id.* at 3 ¶ 3, and Ex. B.) The First Amended Consent Order includes a set of "Statements," attached as Exhibit A, and a Pricing and Promotional Allowances Plan, attached as Exhibit B. (Spiva Decl.

Ex. 2 at 3 ¶ 2.) Exhibits A and B to the First Amended Consent Order have not been provided to the Court.

The First Amended Consent Order provides:

It is conclusively agreed and adjudged that the Plan complies fully and in all respects with the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, Houghton Mifflin insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with the Plan. It is further conclusively agreed and adjudged that Exhibit B to the original October 1995 Consent Order, which exhibit is incorporated into this Consent Order by reference, complies fully and in all respects with the Rules established pursuant to the October 1995 Consent Order and the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, Houghton Mifflin insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with that Exhibit B prior to the date of the entry of this Consent Order.

(*Id.* at 3–4 ¶ 3.)

The First Amended Consent Order further provides:

Plaintiffs, on behalf of themselves, their predecessors, successors, assigns, parents, affiliates, and subsidiaries, waive and release any and all claims or causes of action, actions, complaints, and suits, at law or in equity, known or unknown (collectively "claims") that each or all of them has, have, or may have against Houghton Mifflin, its predecessors, successors, assigns, parents, affiliates, and subsidiaries, and each of their directors, officers, employees, agents, shareholders, and attorneys, from the beginning

of time until and through October 30, 1995, arising under the Robinson–Patman Act or any other law arising from or relating to any of Houghton Mifflin's pricing or promotional practices, but reserve the right to challenge, pursuant to the terms of this Consent Order, any of Houghton Mifflin's pricing or promotional practices in effect after the date of entry of this Consent Order that are not included in the Pricing and Promotional Allowances Plan (the "Plan") set forth in Exhibit B to this Consent Order and incorporated into this Consent Order by reference.

(*Id.* at 3 ¶ 2.)

The First Amended Consent Order also provides:

To the fullest extent permissible by law with respect to any claim for equitable relief, this Consent Order shall bind and inure to the benefit of all members of the American Booksellers Association on whose behalf the Association purports to bring this suit seeking injunctive relief. Nothing in this Consent Order shall be used or submitted as evidence or to establish any standard of conduct or interpretation of applicable law, or be construed to have the effect of res judicata, collateral estoppel, waiver, admission, or any other effect on Houghton Mifflin in any suit or claim filed or asserted against Houghton Mifflin[.]

(*Id.* at 7 ¶ 7.)

█ The First Amended Consent Order clearly was intended by the parties to resolve all claims between the New York plaintiffs against Houghton Mifflin for unlawful price discrimination through October 30, 1995. (*Id.* at 3 ¶ 2.) As there was no finding that Houghton Mifflin did or did not violate the law prior to that date, however, the New York plaintiffs' settlement with Houghton Mifflin does not preclude them from suing defendants in this lawsuit for receiving discounts from Houghton Mifflin prior to October 30, 1995. In other words, the fact that the New York plaintiffs settled with Houghton–Mifflin, without a finding of liability, does not bar them from suing defendants in this lawsuit for receiving the same discounts.

The First Amended Consent Order also clearly is intended to preclude ABA members from suing Houghton Mifflin for conduct occurring between January 1, 1996 and September 23, 1998 that complies with the pricing plan set forth in Exhibit B to the original Consent Order. (*Id.* at 4 ¶ 3 and 7 ¶ 7.) It also is clearly intended to preclude ABA members from suing Houghton Mifflin for any conduct on or after September 23, 1998 that complies with the Plan set forth in Exhibit B to the First Amended Consent Order. (*Id.*) The Consent Orders thus created a safe harbor for Houghton Mifflin after January 1, 1996 as long as it complied with the guidelines set forth therein.

Nothing in the First Amended Consent Order, however, even suggests an intent by the New York plaintiffs that the discounts set forth in Exhibit B to the original Consent Order, or the statements in Exhibits A and B to the First Amended Consent Order, should be deemed to apply to any publisher except Houghton–Mifflin. For example, a 2 percent discount that may be a lawful functional discount, or may be cost-justified, when given by Houghton–Mifflin may not be lawful when given by another publisher who has different costs. Nothing in the First Amended Consent Order suggests that the discounts in Exhibit B to the original Consent Order, or the statements in Exhibits A and B to the First Amended Consent Order, were intended to be a benchmark for lawful conduct for all publishers.

To the extent the consent orders approved certain discounts by Houghton Mifflin, however, plaintiffs in this lawsuit cannot challenge defendants' receipt of those discounts, because defendants' liability is derivative of the liability of the publisher. As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–Patman Act unless the publisher is liable for violating § 2(a), plaintiffs in this lawsuit are precluded from suing defendants for (1) receiving any discounts from Houghton Mifflin between October 30, 1995 and September 23, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order; and (2) receiving any discounts from Houghton Mifflin on or after September 23, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order. To the extent plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

### 2.

On November 28, 1995, the New York plaintiffs and Penguin entered into a Consent Order. (Spiva Decl. Ex. 3 at 9.) That Consent Order was superseded by a Superseding Consent Order on September 30, 1997. (*Id.* Ex. 4 at 24, ¶ 16 and 25.) On November 7, 1999, the Superseding Consent Order was amended to delete provisions that required an expert to monitor Penguin's compliance with the terms of the Superseding Consent Order. (*Id.* Ex. 11.)

The Superseding Consent Order provides:

As of the Effective Date,[8] the Publishers[9] shall comply with the Statements attached hereto as Exhibit A (the "Statements") and Additional Statements attached hereto as Exhibit B (the "Additional Statements") which are incorporated into this Superseding Consent Order by reference, in the sale, after the Effective Date, to customers (as that term is defined in the Statements) of (a) books published by the Publishers and offered for resale and (b) books distributed by the Publishers and offered for resale on price or promotional allowance terms set by the Publishers.

(*Id.* Ex. 4 at 3–4 ¶ 2.) The Statements and Additional Statements set forth guidelines for book pricing. (*Id.* Ex. 4 at Exs. A and B.)

The Superseding Consent Order also provides:

Plaintiffs, on behalf of themselves, their predecessors, successors, assigns, parents, affiliates, and subsidiaries, waive and release any and all existing and potential claims or causes of action, actions, complaints, and suits (collectively, "claims"), at law or in equity, known or unknown, that each or all of them has, have or may have against the Publishers, their predecessors, successors, assigns, parents, affiliates and subsidiaries, and against each of their directors, officers, employees, agents, shareholders, and attorneys, from the beginning of time until the Effective Date, arising under the Robinson–Patman Act or any other law (including the 1995 Consent Order), arising from or relating to any of the Publishers' pricing, credit or promotional practices, including, but not limited to, claims for any cash discounts for sales made, or for payments made, or which were first negotiated, prior to March 1, 1997, any claims relating to the pricing, credit or promotional practices

---

**8.** The "Effective Date" is defined as September 30, 1997 for Penguin and January 1, 1998 for Putnam. (*Id.* at 3 ¶ 2.)

**9.** The "Publishers" are Penguin and Putnam. (*Id.* at 1.)

(including any discounting practices) of the Publishers which were in effect before the Effective Date, any claims relating to or arising from sales made by the Publishers prior to the Effective Date, or claims relating to or arising from payments for such sales, any claims based on sales to distributors, wholesalers, jobbers or retailers, any claims based on any alleged failure of the Publishers to comply with discovery or disclosure requirements, and any claims relating to the entry of this Superseding Consent Order, the circumstances of its negotiation, or the sufficiency or appropriateness of its terms. Plaintiffs reserve the right to challenge any of the Publisher's pricing, credit or promotional practices that are in effect after the Effective Date, provided, however, that Plaintiffs shall not bring any action or other proceeding against the Publishers relating to the Publishers' pricing, credit or promotional practices, except pursuant to the terms of this Superseding Consent Order.

(*Id.* Ex. 4 at 4–5 ¶ 2.) "Nothing herein shall in any way preclude the Publishers from adopting and implementing any pricing, credit or promotional practices so long as those practices are consistent with the Statements and the Additional Statements." (*Id.* at ¶ 3.)

The Superseding Consent Order further provides:

Nothing in this Superseding Consent Order shall be (a) used or submitted as evidence or to establish any standard of conduct or interpretation of applicable law, or (b) construed to have the effect of res judicata, collateral estoppel, waiver, or admission or any other effect on the Publishers, in any action or claim filed or asserted against the Publishers .... In consideration of the payment and other relief provided herein, it is the intention of the Plaintiffs and the Publishers that non-party ABA members ... who have held or hold membership in the ABA at any time after May 27, 1994, be bound by the terms of this Superseding Consent Order for all purposes, to the maximum extent permitted by law[.]

(*Id.* at 7–9 ¶ 6.)

The parties clearly intended the Superseding Consent Order to resolve all claims against Penguin for unlawful price discrimination through September 30, 1997, and against Putnam for unlawful price discrimination through January 1, 1998. (*Id.* at 4–5 ¶ 2.) There is no language in the Superseding Consent Order, however, that purports to resolve any claims against the recipients of those allegedly unlawful discounts. Thus, the Superseding Consent Order does not preclude plaintiffs from suing defendants in this lawsuit for receiving unlawful discounts from Penguin prior to September 30, 1997, or from Putnam prior to January 1, 1998.

The Superseding Consent Order also clearly is intended to preclude the New York plaintiffs from suing Penguin for any conduct on or after September 30, 1997, or Putnam for any conduct on or after January 1, 1998, that complies with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order. (*Id.* ¶¶ 2, 3.) The Superseding Consent Orders thus created a safe harbor for Penguin and Putnam as long as they complied with the guidelines set forth therein. Nothing in the Superseding Consent Order, however, even suggests an intent by the New York plaintiffs that the guidelines set forth in Exhibits A and B were intended to be a benchmark for lawful conduct by all publishers.

As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–

Patman Act unless the publisher is liable for violating § 2(a), plaintiffs in this lawsuit (if they were ABA members at any time after May 27, 1994) are precluded from suing defendants for (1) receiving discounts from Penguin on or after September 30, 1997 that comply with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order; and (2) receiving discounts from Putnam on or after January 1, 1998 that comply with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order. To the extent plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

### 3.

On July 31, 1996, the New York plaintiffs and Rutledge Hill entered into a Consent Order. (Spiva Decl. Ex. 5 at 9.) That Consent Order was superseded by a First Amended Consent Order on October 13, 1998. (*Id.* Ex. 6 at 1–2, 6.)

The original Consent Order set forth a set of Rules for Application of the Robinson–Patman Act to Book Publishing, which reflected the parties' agreement as to the Robinson–Patman Act's application to the practices of Rutledge Hill. (*Id.* Ex. 5 at 2 ¶ 2, and Ex. A.) It also set forth a list of approved discounts that the parties agreed complied with the Robinson–Patman Act. (*Id.* at 3 ¶ 3, and Ex. B.) The First Amended Consent Order includes a set of "Statements," attached as Exhibit A, and a Pricing and Promotional Allowances Plan, attached as Exhibit B. (*Id.* Ex. 6 at ¶ 2.)

The First Amended Consent Order provides:

Effective as of September 1, 1996, Rutledge Hill shall, in the sale of (a) books published by Rutledge Hill and offered for resale and (b) books distributed by Rutledge Hill and offered for resale on price or promotional allowance terms set by Rutledge Hill, comply with the Statements (the "Statements") attached as Exhibit A and incorporated into this Consent Order by reference. Plaintiffs, on behalf of themselves, their predecessors, successors, assigns, parents, affiliates, and subsidiaries, waive and release any and all claims or causes of action, actions, complaints, and suits, at law or in equity, known or unknown (collectively "claims") that each or all of them has, have, or may have against Rutledge Hill, its predecessors, successors, assigns, parents, affiliates, and subsidiaries, and each of their directors, officers, employees, agents, shareholders, and attorneys, from the beginning of time until and through July 31, 1996, arising under the Robinson–Patman Act or any other law arising from or relating to any of Rutledge Hill's pricing or promotional practices, but reserve the right to challenge, pursuant to the terms of this Consent Order, any of Rutledge Hill's pricing or promotional practices in effect after the date of entry of this Consent Order that are not included in the Pricing and Promotional Allowances Plan (the "Plan") set forth in Exhibit B to this Consent Order and incorporated into this Consent Order by reference.

(*Id.* ¶ 2.) The First Amended Consent Order also provides:

It is conclusively agreed and adjudged that the Plan complies fully and in all respects with the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, Rutledge Hill insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with the Plan. It is further conclusively agreed and adjudged that Exhibit B to the original July 31, 1996

Consent Order, which exhibit is incorporated into this Consent Order by reference, complies fully and in all respects with the Rules established pursuant to the July 31, 1996 Consent Order and the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, Rutledge Hill insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with that Exhibit B prior to the date of the entry of this Consent Order.

(*Id.* at ¶ 3.)

The First Amended Consent Order also provides:

> To the fullest extent permissible by law with respect to any claim for equitable relief, this Consent Order shall bind and inure to the benefit of all members of the American Booksellers Association on whose behalf the Association purports to bring this suit seeking injunctive relief. Nothing in this Consent Order shall be used or submitted as evidence or to establish any standard of conduct or interpretation of applicable law, or be construed to have the effect of res judicata, collateral estoppel, waiver, admission, or any other effect on Rutledge Hill in any suit or claim filed or asserted against Rutledge Hill[.]

(*Id.* at ¶ 7.)

The First Amended Consent Order clearly was intended by the parties to resolve all claims by the New York plaintiffs against Rutledge Hill for unlawful price discrimination through July 31, 1996. (*Id.* at ¶ 2.) It does not, however, purport to resolve claims against recipients of those discounts. Thus, the First Amended Consent Order does not preclude plaintiffs in this lawsuit from suing defendants for receiving unlawful discounts from Rutledge Hill prior to July 31, 1996.

The First Amended Consent Order also clearly is intended to preclude ABA members from suing Rutledge Hill for conduct occurring between July 31, 1996 and October 13, 1998 that complies with the pricing plan set forth in Exhibit B to the original Consent Order. (*Id.* at ¶ 3; and ¶ 7.) It also is clearly intended to preclude ABA members from suing Rutledge Hill for any conduct on or after October 13, 1998 that complies with the Plan set forth in Exhibit B to the First Amended Consent Order. (*Id.* at ¶¶ 2–3.) It thus creates a safe harbor for Rutledge Hill as long as it complies with the requirements set forth in those exhibits. Nothing in the First Amended Consent Order, however, even suggests an intent by the New York plaintiffs that the discounts set forth in Exhibit B to the original Consent Order, or the statements in Exhibits A and B to the First Amended Consent Order, should be deemed to apply to any publisher except Rutledge Hill.

As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–Patman Act unless the publisher is liable for violating § 2(a), plaintiffs in this lawsuit are precluded from suing defendants for (1) receiving any discounts from Rutledge Hill between July 31, 1996 and October 13, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order; and (2) receiving any discounts from Rutledge Hill on or after October 13, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order. To the extent plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

### 4.

On August 29, 1996, the New York plaintiffs and St. Martin's entered into a Consent Order. (Spiva Decl. Ex. 7 at 10.) That Consent Order was superseded by a First Amended Consent Order on Septem-

ber 14, 1998. (*Id.* ¶ 10, and Ex. 8 at 2 and ¶ 6.)

The original Consent Order set forth a set of Rules for Application of the Robinson–Patman Act to Book Publishing, which reflected the parties' agreement as to the Robinson–Patman Act's application to the practices of St. Martin's. (*Id.* Ex. 7 at 2 ¶ 2, and Ex. A.) It also set forth a list of approved discounts that the parties agreed complied with the Robinson–Patman Act. (*Id.* at 3 ¶¶ 2–3, and Ex. B.) The First Amended Consent Order includes a set of "Statements," attached as Exhibit A, and a set of New Retail Discount and Promotional Policies, attached as Exhibit B. (*Id.* Ex. 8 at 3 ¶ 2.)

The First Amended Consent Order provides:

> Effective as of January 1, 1997, St. Martin's shall, in the sale of (a) books published by St. Martin's and offered for resale and (b) books distributed by St. Martin's and offered for resale on price or promotional allowance terms set by St. Martin's, comply with the Statements (the "Statements") attached as Exhibit A and incorporated into this Consent Order by reference. Plaintiffs, on behalf of themselves, their predecessors, successors, assigns, parents, affiliates, and subsidiaries, waive and release any and all claims or causes of action, actions, complaints, and suits, at law or in equity, known or unknown (collectively "claims") that each or all of them has, have, or may have against St. Martin's, its predecessors, successors, assigns, parents, affiliates, and subsidiaries, and each of their directors, officers, employees, agents, shareholders, and attorneys, from the beginning of time until and through September 3, 1996, arising under the Robinson–Patman Act or any other law arising from or relating to any of St. Martin's pricing or promotional

> practices, but reserve the right to challenge, pursuant to the terms of this Consent Order, any of St. Martin's pricing or promotional practices in effect after the date of entry of this Consent Order that are not included in the New Retail Discount and Promotional Policies (the "Plan") set forth in Exhibit B and incorporated into this Consent Order by reference.

(*Id.* ¶ 2.) The First Amended Consent Order also provides:

> It is conclusively agreed and adjudged that the Plan complies fully and in all respects with the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, St. Martin's insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with the Plan. It is further conclusively agreed and adjudged that Exhibit B to the original September 3, 1996 consent order, which exhibit is incorporated into this Consent Order by reference, complies fully and in all respects with the Rules established pursuant to that consent order and the Statements and that none of the Plaintiffs will seek to impose any liability on, or obtain any relief from, St. Martin's insofar as it prices, or provides promotional allowances with respect to, books that it sells for resale in accordance with that Exhibit B prior to the date of the entry of this Consent Order.

(*Id.* at ¶ 3.)

The First Amended Consent Order also provides:

> To the fullest extent permissible by law with respect to any claim for equitable relief, this Consent Order shall bind and inure to the benefit of all members of the American Booksellers Association on whose behalf the Association purports to bring this suit seeking injunctive relief.

Nothing in this Consent Order shall be used or submitted as evidence or to establish any standard of conduct or interpretation of applicable law, or be construed to have the effect of res judicata, collateral estoppel, waiver, admission, or any other effect on St. Martin's in any suit or claim filed or asserted against St. Martin's[.]

(*Id.* at ¶ 7.)

The First Amended Consent Order clearly was intended by the parties to resolve all claims by the New York plaintiffs against St. Martin's for unlawful price discrimination through September 3, 1996. (*Id.* at ¶ 2.) It does not, however, purport to resolve claims against recipients of those discounts. Thus, the First Amended Consent Order does not preclude plaintiffs in this lawsuit from suing defendants for receiving unlawful discounts from St. Martin's prior to September 3, 1996.

The First Amended Consent Order also clearly is intended to preclude ABA members from suing St. Martin's for conduct occurring between September 3, 1996 and September 14, 1998 that complies with the pricing plan set forth in Exhibit B to the original Consent Order. (*Id.* at ¶¶ 3 and 7.) It also is clearly intended to preclude ABA members from suing St. Martin's for any conduct on or after September 14, 1998 that complies with the Plan set forth in Exhibit B to the First Amended Consent Order. (*Id.* at ¶¶ 2–3.) It thus creates a safe harbor for St. Martin's as long as it complies with the requirements set forth in those exhibits. Nothing in the First Amended Consent Order, however, even suggests an intent by the New York plaintiffs that the discounts set forth in Exhibit B to the original Consent Order, or the Plan in Exhibit B to the First Amended Consent Order, should be deemed to apply to any publisher except St. Martin's.

As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–Patman Act unless the publisher is liable for violating § 2(a), plaintiffs in this lawsuit are precluded from suing defendants for (1) receiving discounts from St. Martin's between September 3, 1996 and September 14, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order; and (2) receiving discounts from St. Martin's on or after September 14, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order. To the extent plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

5.

On February 7, 1995, the New York plaintiffs and Levin entered into a Consent Order, which was intended to resolve the New York plaintiffs' claims that Levin violated § 2(a) of the Robinson–Patman Act. (Spiva Decl. Ex. 9 at 1, 4.) The Consent Order requires Levin to offer specific terms of sale, and also requires Levin to comply with a set of Rules Governing Non–Discrimination in Pricing. (*Id.* at ¶ 1 and Ex. A.)

The Consent Order clearly was intended by the parties to resolve only their claims against Levin for violation of § 2(a) of the Robinson–Patman Act. It does not purport to resolve any claims they might have against the recipients of unlawful discounts from Levin and, thus, does not preclude plaintiffs in this lawsuit from suing defendants for receiving unlawful discounts from Levin. Moreover, nothing in the Consent Order even suggests an intent by the New York plaintiffs that the discounts set forth in the Consent Order, or the rules set forth in Exhibit A to the Consent Order, should be deemed to apply to any publisher except Levin.

Unlike some of the other Consent Orders, there is no language in this Consent Order that purports to bind the parties or nonparty members of the ABA in future litigation. By agreeing to allow Levin to offer the specific terms of sale set forth in the Consent Order, however, the New York plaintiffs cannot now claim in this lawsuit that defendants' receipt of those terms is unlawful. As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–Patman Act unless the publisher is liable for violating § 2(a), the New York plaintiffs are precluded from suing defendants in this lawsuit for receiving any discounts from Levin after February 7, 1995 that comply with the terms of the Consent Order. To the extent the New York plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

### 6.

On November 18, 1996, the Happy New York plaintiffs entered into a Consent Order with Random House to resolve all of the Happy New York plaintiffs' claims against Random House. (Spiva Decl. Ex. 10 at 1, 6.)

The Consent Order provides:

Effective January 1, 1997, Random House shall, in the sale of (a) books published by Random House and offered for resale and (b) books distributed by Random House and offered for resale on price or promotional allowance terms set by Random House, comply with the Statements attached hereto as Exhibit A and incorporated into this Consent Order by reference (the "Statements").

(*Id.* at 2 ¶ 2.) The Statements set forth certain pricing rules for the sale of books by which Random House agreed to abide. "Nothing herein shall in any way preclude Random House from adopting and implementing any pricing or promotional prac-

tices so long as those practices are consistent with the Statements." (*Id.* at 3 ¶ 3.)

The Consent Order also provides:

Plaintiffs waive any and all claims or causes of action that each or all of them has, have, or may have arising under the Robinson–Patman Act or any other law, with respect to any of Random House's pricing and/or promotional practices from the beginning of time until the date of this Consent Order, but reserve the right to challenge, pursuant to the terms of this Consent Order, any of Random House's pricing and/or promotional practices that are in effect after the date of this Consent Order.

(*Id.* at 2–3 ¶ 2.) The Consent Order further provides:

Nothing in this Consent Order shall be (a) used or submitted as evidence or to establish any standard of conduct or interpretation of applicable law, or (b) construed to have the effect of res judicata, collateral estoppel, waiver, or admission or any other effect on Random House, in any action or claim filed or asserted against Random House[.]

(*Id.* ¶ 6.)

The Consent Order clearly was intended by the parties to resolve all claims by the Happy New York plaintiffs against Random House for unlawful price discrimination through November 18, 1996. (*Id.* at 2–3 ¶ 2.) It does not purport to resolve any claims they might have against the recipients of those discounts, however, and, thus, does not preclude plaintiffs in this lawsuit from suing defendants for receiving unlawful discounts from Random House before November 18, 1996.

The Consent Order also clearly is intended to preclude the Happy New York plaintiffs from suing Random House for conduct occurring after January 1, 1997 that complies with the Statements set

forth in Exhibit A to the Consent Order. (*Id.* ¶¶ 2–3.) Nothing in the Consent Order even suggests, however, an intent by the Happy New York plaintiffs that the Statements set forth in Exhibit A to the Consent Order should be deemed to apply to any publisher except Random House.

Unlike some of the other Consent Orders, there is no language in this Consent Order that purports to bind nonparty members of the ABA in future litigation. By agreeing to allow Random House to offer discounts that comply with the Statements set forth in Exhibit A to the Consent Order, however, the Happy New York plaintiffs cannot now claim in this lawsuit that defendants' receipt of those discounts is unlawful. As defendants in this lawsuit cannot be liable for violating § 2(f) of the Robinson–Patman Act unless the publisher is liable for violating § 2(a), the Happy New York plaintiffs are precluded from suing the defendants for receiving any discounts from Random House on or after January 1, 1997 that comply with the Statements set forth in Exhibit A to the Consent Order. To the extent plaintiffs may wish to claim otherwise in this action, they are both collaterally and judicially estopped from doing so.

### 7.

Defendants contend that even the publishers who did not sign the Consent Orders (the "nonsignatory publishers") are entitled to conduct their business in accordance with the discounts and rules set forth in the Consent Orders, under the "meeting competition" provision of the Robinson–Patman Act. Accordingly, defendants contend that plaintiffs cannot challenge discounts received by defendants from any publisher, as long as those discounts comply with the requirements set forth in the Consent Orders.

Under § 2(b) of the Robinson–Patman Act, a seller can rebut a *prima facie* case of violating the Robinson–Patman Act "by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." 15 U.S.C. § 13(b). This "meeting competition" defense "'at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.'" *Falls City*, 460 U.S. at 438, 103 S.Ct. 1282 (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 451, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). "[T]he defense requires that the seller offer the lower price in good faith *for the purpose* of meeting the competitor's price, that is, the lower price must actually have been a good faith response to that competing low price." *Id.* at 439, 98 S.Ct. 2864. Thus, "[a] seller is required to justify a price difference by showing that it reasonably believed that an equally low price was available to the purchaser and that it offered the lower price for that reason[.]" *Id.* at 444, 98 S.Ct. 2864.

There are very few reported opinions discussing which party has the burden of proof on the meeting competition defense in a buyer liability suit under § 2(f). The Supreme Court has suggested, without expressly holding, that the burden might fall on the defendant-buyer because it would have easy access to evidence that the seller offered it a discounted price in order to meet a competing seller's offer. *Automatic Canteen*, 346 U.S. at 79 n. 23, 73 S.Ct. 1017. The Supreme Court's suggestion was followed in *Thurman Industries, Inc. v. Pay'N Pak Stores, Inc.*, 709 F.Supp. 985, 996 (W.D.Wash.1987).

While the [defendant] buyer may not have evidence relating to a seller's state of mind in quoting a low price, the [defendant] buyer is aware as to whether the price is generally competitive with the price of other sellers. It is up to the [defendant] buyer to come forward with evidence in this regard if it desires to take advantage of the meeting competition defense.

*Id.* The Fifth Circuit, however, has placed the burden of going forward with the evidence on the plaintiff. *Mid–South Distribs. v. FTC,* 287 F.2d 512, 517 (5th Cir. 1961). The Fifth Circuit cites *Automatic Canteen* for the proposition that the plaintiff has the burden of showing that the defendant buyer knew that the seller could not justify its price under the cost-justification or meeting competition defenses. *Id.* The Fifth Circuit did not discuss, however, the language in *Automatic Canteen* that suggests that the burdens may be different for the cost-justification defense than for the meeting competition defense. Accordingly, this Court will follow *Thurman.* Thus, defendants have the burden of showing that the discounts they received from the nonsignatory publishers satisfy the meeting competition defense.

■■■ Defendants have not even attempted to meet that burden. Accordingly, they cannot prevail on their motion for summary judgment that all discounts received from the nonsignatory publishers are lawful under the meeting competition defense to the extent plaintiffs approved those discounts for other publishers in the Consent Orders.

8.

For the reasons stated above, the Borders defendants' motion for partial summary judgment, joined by the Barnes & Noble defendants, is granted in part:

1. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Houghton Mifflin occurring between October 30, 1995 and September 23, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and Houghton Mifflin.

2. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Houghton Mifflin on or after September 23, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and Houghton Mifflin.

3. Plaintiffs (if they were ABA members at any time after May 27, 1994) are precluded from challenging the legality of any discounts defendants received from Penguin on or after September 30, 1997 that comply with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order between the New York plaintiffs and Penguin.

4. Plaintiffs (if they were ABA members at any time after May 27, 1994) are precluded from challenging the legality of any discounts defendants received from Putnam on or after January 1, 1998 that comply with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order between the New York plaintiffs and Penguin.

5. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Rutledge Hill between July 31, 1996 and October 13, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and Rutledge Hill.

6. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Rutledge Hill on or after October 13, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and Rutledge Hill.

7. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from St. Martin's between September 3, 1996 and September 14, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and St. Martin's.

8. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from St. Martin's on or after September 14, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and St. Martin's.

9. The New York plaintiffs are precluded from challenging the legality of any discounts defendants received from Levin after February 7, 1995 that comply with the terms of the Consent Order between the New York plaintiffs and Levin.

10. The Happy New York plaintiffs are precluded from challenging the legality of any discounts defendants received from Random House on or after January 1, 1997 that comply with the Statements set forth in Exhibit A to the Consent Order between the Happy New York plaintiffs and Random House.

The remainder of the Borders defendants' motion for partial summary judgment, joined in by the Barnes & Noble defendants, is denied.

### IV.

Plaintiffs move for summary judgment on two of defendants' affirmative defenses.

First, plaintiffs contend that defendants cannot prevail by showing that the discounts defendants receive do not actually harm competition, because that defense is unavailable to defendants, as a matter of law. The Court will refer to this defense as the "no harm to competition" defense. Second, plaintiffs contend that defendants cannot claim a functional discount defense because the defense is available only to wholesalers, not to retailers.

### A.

■ The Court begins with plaintiffs' motion for summary judgment on the "no harm to competition" defense. The Robinson–Patman Act makes price discrimination unlawful "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, *or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination,* or with customers of either of them[.]" 15 U.S.C. § 13(a) (emphasis added). The Ninth Circuit has found that the underlined language "expresses Congressional intent to protect individual competitors, not just market competition, from the effects of price discrimination." *Chroma Lighting v. GTE Prods. Corp.,* 111 F.3d 653, 657 (9th Cir.1997). The purpose of the underlined passage " 'was to relieve secondary-line plaintiffs—small retailers who are disfavored by discriminating suppliers—from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors.' " *Id.* (quoting *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1446 n. 18 (9th Cir. 1995)).

The requisite injury can be inferred from evidence of a substantial price differ-

ence between competing purchasers over time, because such a price difference may harm the competitive opportunities of individual merchants and, thus, create a reasonable possibility that competition itself may be harmed. *Id.* at 654 (citing *FTC v. Morton Salt Co.,* 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948)); *id.* at 657 (citing *Falls City,* 460 U.S. at 435, 103 S.Ct. 1282). *See also Hasbrouck,* 496 U.S. at 559, 110 S.Ct. 2535 ("[A]n injury to competition may be inferred from evidence that some purchasers had to pay their supplier 'substantially more for their goods than their competitors had to pay.'") In a secondary-line Robinson–Patman Act case—i.e., a case between competing buyers—this inference may not be overcome by proof of no harm to competition. *Chroma Lighting,* 111 F.3d at 658.

Plaintiffs are, thus, correct that if they are able to prove at trial that the *Morton Salt* inference applies, defendants cannot rebut it by showing that any discounts they receive do not actually have any likelihood of harming competition. Plaintiffs' motion for summary judgment must be denied, however, because they have not moved for summary judgment on the issue of whether the *Morton Salt* inference applies to the facts of this case. Unless and until the *Morton Salt* inference is proven to exist, any ruling on the applicability of defenses to that inference would be premature. Thus, although the Court agrees with plaintiffs' argument, it must deny plaintiffs' motion for summary judgment on defendants' "no harm to competition" defense.

### B.

The Court turns to plaintiffs' motion for summary judgment on the functional discount defense. In a nutshell, plaintiffs' argument is that defendants cannot claim that the RDC discounts they receive from publishers are functional discounts because defendants are not wholesalers, but merely use their RDCs to warehouse books for sale in their own retail outlets. Plaintiffs contend that only true wholesalers—those who sell books only to third-party retailers—can claim functional discounts.

■ "A functional discount is one given to a purchaser based on its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier." *Hasbrouck,* 496 U.S. at 554 n. 11, 110 S.Ct. 2535. A price differential that is reasonably related to the purchaser's costs in performing marketing functions for the supplier, or to the supplier's savings in having those functions performed by the purchaser, is not illegal under the Robinson–Patman Act. *Id.* at 562–63, 110 S.Ct. 2535. "A supplier need not satisfy the rigorous requirements of the cost justification defense in order to prove that a particular functional discount is reasonable and accordingly did not cause any substantial lessening of competition between a wholesaler's customers and the supplier's direct customers." *Id.* at 561, 110 S.Ct. 2535 (footnote omitted).

Although the burden of proving a cost-justification defense lies with the supplier, "the burden of proof remains with the enforcement agency or plaintiff in circumstances involving functional discounts since functional pricing negates the probability of competitive injury, an element of a prima facie case of violation" of the Robinson–Patman Act. *Id.* at 561 n. 18, 110 S.Ct. 2535 (quoting Rill, Availability and Functional Discounts Justifying Discriminatory Pricing, 53 Antitrust L.J. 929, 935 (1985)). *See also id.* at 571, 110 S.Ct. 2535 ("When a functional discount is legitimate, the inference of injury to competition recognized in the *Morton Salt* case will simply not arise.") Thus, a defendant who shows that

the discounts that it receives are lawful functional discounts negates the causation element of the plaintiffs' *prima facie* case. *Id.*

In *Hasbrouck,* the plaintiffs were a number of retail gas stations ("retailers") who sued Texaco for selling gasoline to two distributors, Gull Oil Company ("Gull") and Dompier Oil Company ("Dompier"), at a lower price than it sold gasoline to the retailers. *Id.* at 548–49, 110 S.Ct. 2535. Both Gull and Dompier picked up Texaco's gasoline from the Texaco plant and delivered it directly to retail outlets. *Id.* at 550, 110 S.Ct. 2535. Gull sold the gasoline under its own name at its own retail outlets. *Id.* at 549, 110 S.Ct. 2535. Dompier sold the gasoline under the Texaco name to retail stations. *Id.* Some of the stations serviced by Dompier were independently owned, and some were owned by Dompier. *Id.* at 549–50, 110 S.Ct. 2535. Thus, Dompier acted as both a true wholesaler, by selling gasoline to retailers in which it had no ownership interest, and as a vertically integrated retailer that performed its own wholesaling functions by delivering gasoline from Texaco to Dompier's own gas stations. Here, it is undisputed that the Barnes & Noble and Borders defendants sell all of the books that move through their RDCs to their own retail stores and, thus, act as vertically integrated retailers.

The district court in *Hasbrouck* recognized this distinction. It noted that "[w]hile there is a serious question as to whether Dompier was entitled to a 'functional discount' on the gas it sold at retail, the court assumes, arguendo, that the mere fact that Dompier retailed the gas does not preclude a functional discount." *Hasbrouck v. Texaco, Inc.,* 634 F.Supp. 34, 37 n. 4 (E.D.Wash.1985) (citing *In re Mueller Co.,* 60 F.T.C. 120, 1962 WL 8493 (1962) and *In re Doubleday & Co.,* 52 F.T.C. 169 (1955)). The court also used a

definition of functional discount that would apply regardless of whether the defendant sold the discounted gasoline at its own retail stations or to nonaffiliated retailers: "Technically, a 'functional discount' disregards the buyer's level in the distribution scheme and rewards the buyer for actually performing functions which otherwise would be performed by the seller." *Id.* at 36 n. 2. "[A] 'functional discount' should be available to any buyer—regardless of its trade level—who performs functions for the seller." *Id.* at 36.

> Generally, functional discounts do not trigger Robinson–Patman liability either because the buyer who receives the discount and the buyer who does not are on different trade levels (and therefore are not competitors) *or* because the discount merely offsets the competing buyer's additional costs incurred in performing the seller's functions.

*Id.* at 37 (emphasis added). The district court found that Texaco's discounts to Gull and Dompier were not lawful functional discounts because the lower retail prices offered by Gull, Dompier, and their customers demonstrated that the discounts Gull and Dompier received from Texaco more than offset their costs in performing functions for Texaco. *Id.* at 37–38. Moreover, the lower retail prices attracted customers away from the plaintiffs. *Id.* Thus, the district court found that the discounts Texaco gave to Gull and Dompier injured competition. *Id.*

The Ninth Circuit affirmed, but did not directly address the distinction between functional discounts granted to wholesalers and functional discounts granted to vertically integrated retailers. *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034 (9th Cir.1987). It affirmed the district court on the ground that

> there was sufficient evidence to permit the jury to find that the price differen-

tial did not represent a legitimate functional discount and that all or a portion of the discount received by Dompier and Gull was passed on to Hasbrouck's competitors.... Thus, there was sufficient evidence to permit the jury to conclude that competition may have been harmed, i.e., that there was 'a reasonable possibility' that a competitive injury had occurred.

*Id.* at 1041 (citing *Falls City,* 460 U.S. at 434–35, 103 S.Ct. 1282) (footnote omitted).

Because both the district court and the appellate court found that Texaco had not established that the discounts it gave to Gull and Dompier were reasonably tied to the cost of the tasks Gull and Dompier performed for Texaco, they had no reason to rule on whether Gull and Dompier could claim the functional discount defense on gasoline that they sold to their own retailers. That issue would have been squarely raised only if the discounts Texaco granted them *were* reasonably cost-based. Because the issue was not squarely addressed in the district court or Ninth Circuit opinions, it is no surprise that it was not squarely addressed by the Supreme Court either.

The Supreme Court affirmed for essentially the same reasons set forth by the district court and the Ninth Circuit. *Hasbrouck,* 496 U.S. at 562, 110 S.Ct. 2535. Throughout the opinion, however, there is language suggesting that were the issue squarely before it, the Supreme Court would agree with the district court's assumption that functional discounts are available even to vertically integrated retailers such as the Barnes & Noble and Borders defendants.

The Supreme Court agreed with the Federal Trade Commission's suggested definition of a functional discount: "A functional discount is one given to a purchaser based on its role in the supplier's

distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier." *Id.* at 554 n. 11, 110 S.Ct. 2535. The Supreme Court also agreed generally with the following description of the legal status of functional discounts:

[S]uppliers granting functional discounts either to single-function or integrated buyers should not be held responsible for any consequences of their customers' pricing tactics. Price cutting at the resale level is not in fact, and should not be held in law, 'the effect of' a differential that merely accords due recognition and reimbursement for actual marketing functions....

"On the other hand, the law should tolerate no subterfuge. For instance, where a wholesaler-retailer *buys* only part of his goods as a wholesaler, he must not claim a functional discount on all. Only to the extent that a buyer *actually* performs certain functions, assuming all the risk, investment, and costs involved, should he legally qualify for a functional discount. Hence a distributor should be eligible for a discount corresponding to any part of the function he actually performs on that part of the goods for which he performs it."

*Id.* at 560–61, 110 S.Ct. 2535 (quoting Report of the Attorney General's National Committee to Study the Antitrust Laws ("Report") (1955) at 208). The Supreme Court also quoted the following passage from the same Report:

"In our view, to relate discounts or prices solely to the purchaser's resale activities without recognition of his buying functions thwarts competition and efficiency in marketing. It compels affirmative discrimination against a substantial class of distributors, and hence serves as a penalty on integration. If a business actually fulfills the wholesale

function by relieving his suppliers of risk, storage, transportation, administration, etc., his performance, his capital investment, and the saving to his suppliers, are unaffected by whether he also performs the retailing function, or any number of other functions. A legal rule disqualifying him from discounts recognizing wholesaling functions actually performed compels him to render these functions free of charge."

*Id.* at 560 n. 17, 110 S.Ct. 2535 (quoting Report at 207).

The Supreme Court also noted, however, that sellers are more likely to be able to "effectuate tertiary line price discrimination through functional discounts to a secondary line buyer when the favored distributor is vertically integrated." *Id.* at 565–66, 110 S.Ct. 2535. Evidence that a favored distributor performs both wholesale and retail functions "frequently signal[s] the illegitimacy under the Act of what is alleged to be a permissible functional discount." *Id.* at 570, 110 S.Ct. 2535. This is not because wholesaler-retailers are not entitled to claim the functional discount defense at all, however, but because the wholesaler-retailer is only "eligible for a discount corresponding to any part of the function he actually performs [for the seller] on that part of the goods for which he performs it." *Id.* at 561, 110 S.Ct. 2535 (quoting Report at 208).

It thus appears that if the issue were squarely before the Supreme Court, it would hold that the functional discount defense is available to any purchaser who performs marketing or wholesaling functions for the seller, regardless of whether the purchaser is also a retailer. The same law applies to plaintiffs' state law claims. *Diesel Electric,* 16 Cal.App.4th at 217, 20 Cal.Rptr.2d at 70–71; *see also* Cal. Bus. & Prof.Code § 17042.

The only post-*Hasbrouck* case law that plaintiffs cite is *In re Boise Cascade Corp.,* 113 FTC 956 (1990). The Court agrees with defendants that this decision by the Federal Trade Commission does not support plaintiffs' position. The Federal Trade Commission found that the discounts Boise Cascade Corp. ("Boise") received were not legitimate functional discounts because they were not offered to retailers who performed the same functions for the seller that Boise did; it did not find that Boise was not entitled as a matter of law to claim a functional discount defense on any discounts it received as a vertically integrated retailer. Thus, the *Boise* decision provides no support for plaintiffs' position.

As plaintiffs' motion for summary judgment on the functional discount defense is based entirely on the contention that the RDCs operated by the Barnes & Noble and Borders defendants are not true wholesalers because they ship books only to defendants' own retailers, plaintiffs' motion for summary judgment is denied.

## V.

Defendants move for summary judgment on the ground that plaintiffs cannot show that certain discounts received by defendants are unlawful. First, defendants contend that plaintiffs cannot show that the RDC discounts defendants receive are not lawful functional discounts, are not cost-justified, or that defendants knew the RDC discounts were not lawful functional discounts or cost-justified. Second, defendants contend that plaintiffs cannot show that incentives granted to defendants by Ingram were not cost-justified, or that defendants knew they were not cost-justified. Third, defendants contend that plaintiffs cannot assert a claim against them, as a matter of law, for receipt of discriminatory promotional allowances. Alternatively, de-

fendants contend that plaintiffs cannot show that those promotional allowances were not lawful functional discounts, or that defendants knew that the functional discount defense did not apply. Fourth, defendants contend that plaintiffs cannot show that defendants received discriminatory credit terms, or that defendants knew that they received discriminatory credit terms.

### A.

#### 1.

The Court has already discussed the law that is applicable to functional discounts. The Supreme Court has held that "the burden of proof remains with the enforcement agency or plaintiff in circumstances involving functional discounts since functional pricing negates the probability of competitive injury, an element of a prima facie case of violation" of the Robinson–Patman Act. *Hasbrouck*, 496 U.S. at 561 n. 18, 110 S.Ct. 2535 (quoting Rill, Availability and Functional Discounts Justifying Discriminatory Pricing, 53 Antitrust L.J. 929, 935 (1985)). Nonetheless, it appears that defendants still have the burden of going forward with evidence on their functional discount claim, which plaintiffs then have the burden of disproving. *See id.* at 560, 110 S.Ct. 2535 (referring to sellers' need to "prove that a particular functional discount is reasonable and accordingly did not cause any substantial lessening of competition between a wholesaler's customers and the supplier's direct customers"); *id.* at 561 n. 18, 110 S.Ct. 2535 (noting that sellers, by claiming functional discounts, can "defend against claims under the Act by negating the causation element in the case against them[.]"). Thus, before the plaintiff should be required to disprove the existence of a functional discount, the defendant must at least raise a functional dis-

count defense and present some evidence that the discounts it receives are, in fact, lawful functional discounts.

#### 2.

The cost-justification defense is set forth in the text of the Robinson–Patman Act: "[N]othing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered." 15 U.S.C. § 13(a). Cost justification is an affirmative defense. *Hasbrouck*, 496 U.S. at 555, 110 S.Ct. 2535. Thus, the supplier has the burden of proving that a differential discount it grants to certain purchasers is cost-justified. *Id.* at 561 n. 18, 110 S.Ct. 2535.

In a § 2(f) case, the buyer is not liable if the lower prices he receives "are either within one of the seller's defenses such as the cost justification or not known to him not to be within one of those defenses." *Automatic Canteen*, 346 U.S. at 74, 73 S.Ct. 1017. It is not entirely settled where the burden lies when the cost-justification defense arises in a case between two buyers under § 2(f). *Automatic Canteen* is the leading case, but that case was brought by the Federal Trade Commission, not by a buyer claiming to be injured by discounts received by another buyer. The Court recognized that information about sellers' costs "not only [is] not in the buyer's hands but [is] ordinarily obtainable even by the seller only after detailed investigation of the business." *Id.* at 69, 73 S.Ct. 1017. Thus, "[a] subpoena of the seller's records is not likely to be adequate." *Id.* In addition,

> Insistence on proof of costs by the buyer might thus have other implications; it would almost inevitably require a degree of cooperation between buyer and seller,

as against other buyers, that may offend other antitrust policies, and it might also expose the seller's cost secrets to the prejudice of arm's-length bargaining in the future.

*Id.* at 70, 73 S.Ct. 1017. The Court noted that "the fact that the buyer does not have the required information, and for good reason should not be required to obtain it, has controlling importance[.]" *Id.* at 78, 73 S.Ct. 1017. "Certainly the Commission with its broad power of investigation and subpoena, prior to the filing of a complaint, is on a better footing to obtain this information than the buyer." *Id.* at 79, 73 S.Ct. 1017.

The Court rejected the Federal Trade Commission's argument that once it showed that the buyer knew it received different prices than other buyers, the burden of coming forward with evidence of the seller's costs and the buyer's knowledge of those costs shifted to the buyer defendant. *Id.* Instead, the Court placed upon the Federal Trade Commission the burden of going forward with some evidence that the buyer knew the prices it received were not cost-justified, but hastened to add that meeting this burden should not be too difficult. *Id.* The Court then gave some nonexclusive examples of ways to meet the burden of going forward with evidence of the buyer's knowledge:

> By way of example a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner or with the same amount of exertion as the other buyer can fairly be charged with notice that a substantial price differential cannot be justified. The Commission need only to show, to establish its prima facie case, that the buyer knew that the methods by which he was served and quantities in which he purchased were the same as in the case of his competitor. If the

methods or quantities differ, the Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings. The showing of knowledge, of course, will depend to some extent on the size of the discrepancy between cost differential and price differential, so that the two questions are not isolated. A showing that the cost differences are very small compared with the price differential and could not reasonably have been thought to justify the price difference should be sufficient.

*Id.* at 80, 73 S.Ct. 1017. Once this initial burden is met, the burden then shifts to the defendant to show that the prices it received were not cost-justified, or that it did not know that they were not cost-justified. 15 U.S.C. § 13(b) ("the burden of rebutting the prima facie case ... by showing justification shall be upon the person charged with a violation[.]").

■ Although *Automatic Canteen* addressed the burden of going forward in a § 2(f) case where the Federal Trade Commission was the plaintiff, at least one case has held that the same burden applies when there is a private plaintiff. *Thurman,* 709 F.Supp. at 995. The Court will assume that plaintiffs here have the *Automatic Canteen* burden of producing evidence that defendants knew the discounts it received from the publishers were not cost-justified, and that once that burden is met, defendants have the burden of proving that the discounts either were cost-justified or that they did not know or reasonably should not have known that the discounts were not cost-justified.

### B.

Defendants move for summary judgment on the issue of whether the RDC discounts they receive from publishers are lawful functional discounts or are cost-justified. It is undisputed that defendants have operated RDCs, which receive books in bulk from publishers and redistribute them to defendants' individual retail stores, since well before the period of time that is at issue in this lawsuit. It also appears to be undisputed that the defendants receive an RDC discount of 2 percent off the retail list price for trade books and 4 percent off the retail list price for mass market books. Thus, the parties do not dispute the existence of the RDC discounts, but argue only over their legality.

Defendants' experts Anne T. Coughlan ("Coughlan"), William D. O'Connell ("O'Connell"), and Alan J. Cox disagree with the conclusions of plaintiffs' expert Gary L. Frazier ("Frazier") about the legality of the RDC discounts that defendants receive from publishers. This creates a classic dispute of fact that cannot be resolved on summary judgment. The Court does not find that Frazier's lack of experience in the publishing or accounting industries, his lack of access to publisher cost data, or his decision not to rely on certain publisher cost-justification studies, renders his expert opinion so speculative or unreliable as to justify disregarding it altogether. These issues go only to the credibility of his opinion, which cannot be determined at summary judgment. Accordingly, defendants' motion for summary judgment on the legality of the RDC discounts is denied.

### C.

Defendants also move for summary judgment on the legality of discounts and incentives that they receive from Ingram. It is undisputed that Ingram is one of the largest book wholesalers in the country. It also appears to be undisputed that defendants generally receive from Ingram on specified categories of purchases at least an additional 1 percent base discount, or a 1 percent incentive rebate if defendants met certain volume targets.

Defendants' expert Coughlan and plaintiffs' expert Frazier dispute each other's conclusions with respect to the legality of the Ingram discounts. This battle of the experts can only be decided in the courtroom. Accordingly, defendants' motion for summary judgment on the legality of the Ingram discounts is denied.

### D.

Plaintiffs contend that defendants receive promotional allowances from publishers that are not available to plaintiffs and that greatly exceed defendants' actual promotional expenses. Plaintiffs contend that this constitutes indirect price discrimination that is actionable under § 2(f). Defendants contend that there is no private right of action against a buyer for receipt of allegedly discriminatory promotional allowances.

Section 2(d) of the Robinson–Patman Act "makes it unlawful for a supplier in interstate commerce to grant advertising or other sales promotional allowances to one 'customer' who resells the supplier's 'products or commodities' unless the allowances are 'available on proportionally equal terms to all customers competing in the distribution of such products or commodities.' " *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 343, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968) (quoting 15 U.S.C. § 13(d)). Section 2(d) provides, in its entirety:

> It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce

as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d). Section 2(e) similarly prohibits a supplier from providing services or facilities connected with a customer's resale of goods purchased by the supplier, unless those services or facilities are made available to all customers on proportionally equal terms. 15 U.S.C. § 13(e). Sections 2(d) and 2(e), thus, are both concerned with seller conduct relating to the resale of goods. *See Fred Meyer,* 390 U.S. at 343, 88 S.Ct. 904; *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 546 (9th Cir.1983) ("As a general rule, practices related to the resale of commodities are cognizable under section 2(e), while practices related to the original sale of commodities are cognizable under section 2(a).").

Defendants correctly note that the Ninth Circuit has upheld dismissal of a claim by a retailer against another retailer for violating § 2(d) by receiving discriminatory promotional payments. *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 882 n. 15 (9th Cir.1982). "Unlike § 2(f), sections 2(d) and 2(e) do not provide for a buyer's liability for receiving enumerated benefits. Consequently there is no private right of action against buyers for violating those sections." *Id.* (citation omitted). The court noted that the Federal Trade Commission may reach such conduct as an unfair trade practice under § 5 of the Clayton Act. *Id.* (citing *American News Co. v. FTC,* 300 F.2d 104 (2d Cir.1962)). Thus, defendants contend that, as a matter

of law, plaintiffs have no cause of action against them for receiving allegedly discriminatory promotional allowances from publishers.

*Zoslaw* does not, however, address the question presented here. *Zoslaw* does not purport to decide whether excessive promotional allowances can be actionable under §§ 2(a) and 2(f) as indirect price discrimination. In fact, the court remanded the § 2(f) claim for further consideration, without even discussing whether that claim could encompass the plaintiffs' allegation that the buyer received discriminatory promotional allowances. *Id.* at 882.

Plaintiffs argue that to the extent the publishers' promotional allowances to defendants exceed defendants' actual promotional expenditures, they are simply a price subsidy that constitutes indirect price discrimination in violation of § 2(a). Section 2(a) expressly prohibits sellers from engaging in price discrimination "either directly or indirectly." 15 U.S.C. § 13(a). Plaintiffs rely on the Ninth Circuit's decision in *Fred Meyer, Inc. v. FTC,* 359 F.2d 351 (9th Cir.1966), *rev. on other grounds, FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

In order to understand the relevant holding in the Ninth Circuit's *Fred Meyer* decision, the facts must be set forth in some detail. In *Fred Meyer,* the defendant Fred Meyer, Inc. ("Meyer") was a chain of supermarkets that was alleged to have received discriminatory promotional allowances from various suppliers. *Id.* at 355–56. The three suppliers that are relevant for purposes of this discussion are Burlington Industries, Inc. ("Burlington"), Tri–Valley Packing Association ("Tri–Valley"), and Idaho Canning Company ("Idaho Canning"). The case centered around promotional allowances provided to Meyer

in connection with Meyer's annual coupon book promotion. *Id.* Meyer sold a coupon book to its customers for a nominal sum of ten cents, which entitled the customers to discounts on specific products. *Id.* at 355.

Each supplier paid Meyer, at the very least, a flat rate of $350 per coupon page. *Id.* at 356. The payments were sometimes made in cash, sometimes in price discounts on goods purchased for resale during the promotion, and sometimes by replacement of a predetermined portion of the goods sold. *Id.* Some of the suppliers further underwrote the promotion by granting volume-based price reductions, by replacing goods sold, or redeeming coupons in cash at an agreed rate. *Id.*

Burlington participated in the coupon book promotion by reducing its prices to Meyer for nylon hose. *Id.* at 357. Tri–Valley "agreed to pay Meyer $350 (in merchandise or cash, at its option) for a coupon page and to redeem, in merchandise, every third can sold on the coupon's 'Buy two cans and get one free' offer." *Id.* at 359. Idaho Canning's participation in the coupon book promotion was substantially similar to that of Tri–Valley. *Id.*

Meyer contended that it could not be sued under § 2(f) for receiving the suppliers' payments because those payments could not be classified as price reductions cognizable under § 2(a). *Id.* at 361–62. Meyer contended that the suppliers' payments could only be classified as promotional allowances cognizable under § 2(d). *Id.* The Federal Trade Commission responded that §§ 2(a) and 2(d) are not mutually exclusive, and that the two sections overlap so that the suppliers' payments were cognizable under both sections. *Id.* at 362.

The Ninth Circuit expressly declined to decide whether there is any overlap between § 2(d) and § 2(a). *Id.* at 362. Instead, it affirmed the Federal Trade Com-

mission's decision to treat the separate parts of the transactions separately.

We agree with the Commission that a multipartite transaction may in its separate parts violate separate prohibitions of the Robinson–Patman Act. So here. The Commission found that the first $350 payment by each supplier constituted a true promotional payment for which it received value in Meyer's promotional services rendered, and that the balance of each payment, tied as it was to the volume of goods sold and ranging in amount up to one-third of the regular price to Meyer of those goods, constituted a distinct price discrimination, cognizable under section 2(a).

*Id.* at 362. The court also noted that the total amount of payments Meyer received from each supplier greatly exceeded the $350 in advertising that Meyer actually provided. *Id.*

In view of such substantial disparities between receipts and proved allocable expenses, we think the Commission correctly decided that these excesses were 'outright price concessions' and, since the amounts were directly related to and dependent upon the amount of goods purchased and resold by Meyer, price concessions cognizable under section 2(a)[.]

*Id.*

The Ninth Circuit's *Fred Meyer* opinion does not stand for the proposition that plaintiffs assert. The Ninth Circuit did not hold that when a seller provides a promotional allowance that is substantially greater than the actual promotional expenditures by the buyer, the difference between the payments and the expenditures can be challenged as indirect price discrimination under § 2(a). Rather, it held that courts can construe the separate parts of a multi-part transaction separately. *Id.*

at 362. Thus, when the seller provides payment for advertising in conjunction with price discounts, and then labels the entire transaction as a promotional allowance, the court can separate the promotional allowance from the price discounts, and treat the latter as a violation of § 2(a). *Id.* Moreover, the court found that one way to determine whether the separate parts of the transaction should be viewed as a pretext for price discrimination is to compare the total value of the transaction to the amount of advertising actually provided by the buyer. *Id.* The Ninth Circuit's *Fred Meyer* decision does not go so far as to hold that a buyer's receipt of a promotional allowance that is substantially greater than the buyer's actual promotional expenditures can be challenged as indirect price discrimination under § 2(a). In fact, it expressly declined to reach that issue. *Id.*

The Court is aware of only two cases that have squarely addressed whether there is a cause of action under § 2(f) for a buyer's receipt of a promotional allowance that exceeds, or bears no relation to, the buyer's actual promotional expenditures. *See Sofa Gallery, Inc. v. Mohasco Upholstered Furniture Corp.,* 639 F.Supp. 677, 678–79 (D.Minn.1986), and *The Intimate Bookshop, Inc. v. Barnes & Noble, Inc.,* 88 F.Supp.2d 133 (S.D.N.Y.2000). Those cases reached different conclusions.

In *Sofa Gallery,* the court held that receipt of excessive promotional allowances is not actionable under § 2(f). 639 F.Supp. at 678–79. The court held that these payments were not provided by the seller in connection with the original sale of goods to the buyer, but were in connection with the buyer's resale of the goods and, thus, were actionable only under §§ 2(d) or 2(e), and not under §§ 2(a) or 2(f). *Id.*

In *Intimate Bookshop,* the court held that a buyer's receipt of promotional allowances in excess of the costs for legitimate advertising and promotional purposes is actionable under § 2(f), because it constitutes indirect price discrimination in violation of § 2(a). 88 F.Supp.2d at 138. The court relied on language from 16 C.F.R. § 240.9 (1984), however, without recognizing or acknowledging that the language was deleted from the rule in 1990. *Id.* (citing 16 C.F.R. § 240.9 (1984)). That rule provided that " '[a]llowances that have no relationship to cost or approximate cost of the service provided by the retailer may be considered to be in violation of section 2(d) or subject to the prohibitions of section 2(a)[.]' " *Id.* (quoting 16 C.F.R. § 240.9 (1984)).

The court in *Intimate Bookshop* also relied on *O'Connell v. Citrus Bowl, Inc.,* 99 F.R.D. 117, 120–21 (E.D.N.Y.1983). In that case, the district court stated: "Since section 2(a) by its very terms applies to both direct and indirect forms of discrimination, to the extent that the provision of or payment for services or facilities can be construed as indirect price discrimination, its proscription overlaps with those provided by sections 2(d) and 2(e)." *Id.* at 121. *O'Connell,* however, also relied on the repealed language in 16 C.F.R. § 240.9 (1982). *Id.* Moreover, it held, in a case by a retailer against a supplier, that the supplier's provision of promotional allowances in the form of immediate discounts in price, without requiring any proof that the buyer actually used the discount to purchase advertising, clearly fell within the scope of § 2(d), because the issue was the validity of payments in connection with resale of the seller's product. *Id.* at 121–22. Thus, the citations in *Intimate Bookshop* provide very little support for its holding.

■ Nonetheless, *Intimate Bookshop* is in accord with the general tone of the Ninth Circuit's *Fred Meyer* decision. A promotional allowance provided by a seller to a buyer that bears little relationship to the buyer's actual advertising costs provides a cash windfall to the favored buyer and, thus, can only be viewed as a reduction in the buyer's cost of goods. This is easily construed as indirect price discrimination. Accordingly, to the extent the promotional allowances received by defendants do not bear a reasonable relationship to their actual advertising expenditures, the Court agrees with plaintiffs that they can be challenged as indirect price discrimination under § 2(a) and § 2(f). Thus, defendants' motion for summary judgment on the ground that plaintiffs cannot assert a cause of action under the Robinson–Patman Act against defendants for receipt of excessive promotional allowances is denied.

### E.

■ Defendants contend that even if their receipt of promotional allowances is actionable, plaintiffs cannot show that the amount of the allowances does not constitute a lawful functional discount. Plaintiffs have submitted evidence that in 1997 Barnes & Noble received $9,872,300 in promotional allowances from publishers for displays in its superstores, and that it incurred only $2,099,300 in expenses relating to those promotions, for a profit of $7,773,000. (DeBruin Decl. Ex. 38, Golden Dep. at 534:25–535:6, and Ex. 80.) There is also evidence that Borders made $6.4 million in profits from its promotional allowances. (DeBruin Decl. Ex. 50, Slankard Dep. at 185:14–186:10, 192:14–22; *see also* Preovolos Decl. Ex. C, Fisher Report at 23–24.) Although defendants' expert O'Connell contends that these figures are inflated because of their failure to include overhead costs, the Court finds that plaintiffs' evidence is sufficient to create a triable issue of material fact. Accordingly, defendants' motion for summary judgment on the issue of whether plaintiffs can show that the promotional allowances are not lawful functional discounts is denied.

### F.

Defendants move for summary judgment on plaintiffs' claim that they receive discriminatory credit terms from publishers. Defendants contend that plaintiffs cannot show that defendants received discriminatory credit terms, or that defendants knew that they were receiving discriminatory credit terms. In response, plaintiffs state that "although plaintiffs believe that they can show substantial credit discrimination against most plaintiffs," "plaintiffs are not seeking damages or injunctive relief based on a claim that defendants have lowered the effective price they paid for books through discriminatory credit terms." (Opp'n at 58.) As plaintiffs concede that they are not pursuing this claim, and do not even attempt to raise a triable issue of material fact, defendants' motion for summary judgment on plaintiffs' claim that they received unlawful discriminatory credit terms is granted.

### G.

Defendants move for summary judgment on all claims against their Internet and mail order subsidiaries: Marboro Books Corp., Barnes & Noble Online, Inc., barnesandnoble.com llc, barnesandnoble.com, inc., and Borders Online, Inc. None of plaintiffs' expert opinion evidence addresses these defendants, identifies any discriminatory discounts received by these defendants, or opines as to how any discriminatory discounts received by these defendants are likely to harm competition with plaintiffs. Accordingly, defendants' motion for summary judgment on all

claims against Marboro Books Corp., Barnes & Noble Online, Inc., barnesandnoble.com llc, barnesandnoble.com, inc., and Borders Online, Inc. is granted.

### H.

Defendants' final argument is based on the assumption that the Court has granted the remainder of their motion for summary judgment. Defendants contend that the remainder of the discounts at issue are too small by themselves to cause antitrust injury. Because the Court has not granted defendants' motion for summary judgment on the other discounts, it need not consider whether the remainder of the discounts, in isolation, could cause the requisite antitrust injury.

### VI.

Defendants have also filed a motion to strike the deposition testimony of Alex Holtz and Penguin Books USA Inc.'s responses and objections to plaintiffs' first set of interrogatories. The Court has not relied on either of these pieces of evidence in ruling on the motions for summary judgment. Therefore, the Court need not and does not rule on defendants' motion to strike.

### VII.

Accordingly,

IT IS HEREBY ORDERED that:

1. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, that plaintiffs cannot show that any unlawful discounts received by defendants caused injury to plaintiffs is DENIED with respect to plaintiffs' claims for injunctive relief under the Robinson–Patman Act.

2. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, that plaintiffs cannot show that any unlawful discounts received by defendants caused injury to the plaintiffs is GRANTED with respect to plaintiffs' claims for damages under the Robinson–Patman Act.

3. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on plaintiffs' claim for violation of § 17045 of the California Business and Professions Code is GRANTED.

4. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on plaintiffs' claim for violation of § 17200 of the California Business and Professions Code is DENIED.

5. The Borders defendants' motion for partial summary judgment, joined by the Barnes & Noble defendants, is GRANTED IN PART:

a. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Houghton Mifflin occurring between October 30, 1995 and September 23, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and Houghton Mifflin.

b. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Houghton Mifflin on or after September 23, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and Houghton Mifflin.

c. Plaintiffs (if they were ABA members at any time after May 27, 1994) are precluded from challenging the legality of any discounts defendants received from Penguin on or after September 30, 1997 that comply with the Statements and Additional Statements set forth in Exhibits A

and B to the Superseding Consent Order between the New York plaintiffs and Penguin.

d. Plaintiffs (if they were ABA members at any time after May 27, 1994) are precluded from challenging the legality of any discounts defendants received from Putnam on or after January 1, 1998 that comply with the Statements and Additional Statements set forth in Exhibits A and B to the Superseding Consent Order between the New York plaintiffs and Penguin.

e. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Rutledge Hill between July 31, 1996 and October 13, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and Rutledge Hill.

f. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from Rutledge Hill on or after October 13, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and Rutledge Hill.

g. The plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from St. Martin's between September 3, 1996 and September 14, 1998 that comply with the pricing plan set forth in Exhibit B to the original Consent Order between the New York plaintiffs and St. Martin's.

h. Plaintiffs in this lawsuit are precluded from challenging the legality of any discounts defendants received from St. Martin's on or after September 14, 1998 that comply with the Plan set forth in Exhibit B to the First Amended Consent Order between the New York plaintiffs and St. Martin's.

i. The New York plaintiffs are precluded from challenging the legality of any discounts defendants received from Levin after February 7, 1995 that comply with the terms of the Consent Order between the New York plaintiffs and Levin.

j. The Happy New York plaintiffs are precluded from challenging the legality of any discounts defendants received from Random House on or after January 1, 1997 that comply with the Statements set forth in Exhibit A to the Consent Order between the Happy New York plaintiffs and Random House.

The remainder of the Borders defendants' motion for summary judgment is DENIED.

6. Plaintiffs' motion for summary judgment on defendants' "no harm to competition" defense is DENIED, but only because plaintiffs have not yet shown that the *Morton Salt* inference actually applies to the facts of this case.

7. Plaintiffs' motion for summary judgment on defendants' functional discount defense is DENIED.

8. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on the issues of whether the RDC discounts they receive from publishers are lawful functional discounts or are cost-justified is DENIED.

9. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on the issue of whether the discounts and incentives they receive from Ingram are cost-justified is DENIED.

10. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on the ground that plaintiffs cannot assert a cause of action under the Robinson–Patman Act

against defendants for receipt of excessive promotional allowances is DENIED.

11. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on the issue of whether plaintiffs can show that the promotional allowances are not lawful functional discounts is DENIED.

12. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on plaintiffs' claim that they received unlawful discriminatory credit terms is GRANTED.

13. The Barnes & Noble defendants' motion for summary judgment, joined by the Borders defendants, on all claims against Marboro Books Corp., Barnes & Noble Online, Inc., barnesandnoble.com llc, barnesandnoble.com, inc., and Borders Online, Inc. is GRANTED.

14. As summary judgment has been granted on all claims for damages, the trial will now be a bench trial. Trial will begin on Monday, April 9, 2001 at 8:30 a.m.